UNITED STATES *v.* BURNS.

1. The army regulation No. 1002, which declares that " no officer or agent in the military service shall purchase from any other person in the military service or make any contract with any such person to furnish supplies or services, or make any purchase or contract in which such person shall be admitted to any share or part, or to any benefit to arise therefrom," does not apply to contracts on behalf of the United States, which require for their validity the approval of the Secretary of War. The secretary, though the head of the War Department, is not in the military service in the sense of the regulation, but is a civil officer.

2. In February, 1858, a contract was made on behalf of the United States with Sibley, an officer in the army of the United States, for the manu facture and use of what is known as the Sibley tent, of which tent Sibley had secured a patent, by which contract the government was authorized to make and procure as many of the tents as it might require by paying the sum of five dollars for each tent, the contract to continue until the 1st of January, 1859, and longer unless the United States were notified to the contrary. In April, 1858, Sibley executed to Burns, another officer in the army of the United States, an assignment of " the one-half-interest in all the benefits and net profits arising from and belonging to the invention," from and after February 22d, 1856. Soon after the commencement of the rebellion Sibley resigned his commission in the army of the United States and joined the Confederates. Burns remained true in his allegiance to the government of the United States and served in the army of the Union. After the resignation and defection of Sibley one-half of the royalty on each tent made or procured by the government was paid to Burns, under the contract with Sibley, until December 26t , 1861, when further payments to him were forbid-

den by order of the Secretary of War, although the government continued to manufacture and use the tents as previously: *Held*, 1st, that the assignment of Sibley passed to Burns one-half interest in the contract of Sibley with the government, and the right to a moiety of the royalty stipulated; 2d, that the order of the Secretary of War, in December, 1861, did not terminate the contract; 3d, that the War Department, by its previous payments to Burns of one-half of the royalty, stipulated, severed his claim from that of Sibley under the contract; 4th, that the act of March 3d, 1863, in barring Sibley, by reason of his disloyalty, of any action upon the contract with the government in the Court of Claims, does not affect the rights of Burns to his moiety under that contract or his right of action for the same in the Court of Claims. The act severs their claims.

3. The Court of Claims, in deciding upon the rights of claimants, is not bound by any special rules of pleading.

APPEAL from the Court of Claims, in which court the petitioner claimed against the United States the amount due on a contract authorizing them to make and use a certain tent known as the Sibley tent.

The facts found by the Court below were thus:

1st. On the 22d of April, 1856, letters-patent were issued to Major H. H. Sibley for an improved tent, since known as the Sibley tent.

2d. On the 6th of February, 1858, General Thomas, assistant quartermaster-general at Philadelphia, in a letter addressed to W. E. Jones, "agent for the Sibley patent tent," stated that he had received information from the quartermaster-general that the tent might be adopted into the service, provided a satisfactory arrangement could be made for the use of the patent, or for the tents, at a reasonable rate, and proposed that the department should pay him the sum of $5 for each tent made for the use of the army, *as long as the agreement might be confirmed by the War Department,* and asking a reply to the proposition. To this letter Mr. Jones replied that he was willing to enter into a temporary arrangement of that nature, and to authorize the assistant quartermaster to make as many of the tents as the government might require, by paying him $5 for each tent; the arrangement to hold good *until the 1st of January, 1859, and longer, unless notified to the contrary by him.*

On the 18th of February, 1858, the terms proposed in the letter of Mr. Jones were approved by the Secretary of War, and a contract was made accordingly, between the United States and Jones, as the agent of the Sibley tent patent, by which the United States were authorized to make and procure as many of the tents as the government might require by paying $5 for each tent, and this arrangement was to h..'d good-until the 1st of January, 1859, and longer, unless the United States were notified to the contrary. And the tent was adopted as one of the tents of the army by the army regulations.

On the 16th of April, 1858, Sibley assigned to Major W. W. Burns, another officer in the army of the United States, "the one-half interest in all the benefits and net profits arising from and belonging to the invention of a certain improved conical tent, known as the Sibley tent, from and after the 22d of February, 1856, forever."

Soon after hostilities commenced between the United States and the Confederates, Major Sibley resigned his commission in the army of the United States and joined the Confederates. Major Burns remained true to his allegiance and served in the army of the Union.

On the 22d of August, 1861, General Meigs, quartermaster-general, instructed General Thomas, assistant quartermaster-general at Philadelphia, under whose directions Sibley tents were made and contracted for for the United States, that the case of the claim of Major Burns to the royalty of the Sibley tent having been examined by the department, it was considered that he was entitled to one-half of the royalty as originally fixed between the government and Major Sibley, the inventor. It was accordingly directed that General Thomas should pay Major Burns $2.50 on each such tent manufactured by the government, and that the other half of the original royalty, formerly paid to Sibley, would for the future be withheld, as well as all that might be due him; for that in consequence of the defection of that officer, it was considered that all his right and title thereto had reverted to 'he government.

Burns was accordingly, for some time afterwards, paid $2.50 on each tent under the contract.

On the 26th of October, 1861, Major Meigs, quartermaster-general, in a communication to the Secretary of War, submitted the question whether the contract in respect to the royalty allowed Burns was or was not in violation of paragraph 1002 of Revised Regulations for the Army. The paragraph is in these words:

" No officer or agent in the military service shall purchase from any other person in the military service, or make any contract with any such person to furnish supplies or services, or make any purchase or contract in which such person shall be admitted to any share or part, or to any benefit to arise therefrom."

Upon this communication, the government at this time having made 38,158 tents, Mr. Cameron, the Secretary of War, on the 26th December, 1861, indorsed as follows:

" No further payments will be made to Major W. W. Burns on account of royalty on the Sibley tent."

This order was communicated to officers of the War Department, though not communicated to the petitioner or the patentee, Major Sibley, but from its date no payments on account of the royalty were made. The last payment on account of the royalty was on the 3d of September, 1861. Notwithstanding the order, however, the government continued to make and use the tents. The petition of Burns asked for payment from the government of one-half the royalty, or $2.50, for those tents which it had made and not paid him for.

On the 3d March, 1863, Congress passed an act amending the act establishing the Court of Claims, the twelfth section of which amendatory act provides:

" That in order to authorize the said court to render a judgment in favor of any claimant, if a citizen of the United States, it shall be set forth in the petition that the claimant . . . has at all times borne true allegiance to the government of the

United States, and . . . has not in any way voluntarily aided, abetted, or given encouragement to rebellion against the said government, which allegation may be traversed by the government; and if on the trial such issue shall be decided against the claimant his petition shall be dismissed."*

The original act establishing the Court of Claims gives the court jurisdiction—

"To hear and determine all claims founded upon by law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the government of the United States, that may be suggested to it by a petition filed therein, &c."†

The Court of Claims entered a judgment in favor of the petitioner for one-half of the royalty, or $2.50 on each of 40,497 tents (the number which, as a fact, it found had been made), amounting to the sum of $101,242.50.

From this judgment the United States appealed.

*Mr. B. H. Bristow, Solicitor-General, and Mr. C. H. Hill, Assistant Attorney-General, for the United States:*

We do not ourselves make, as a point, the question submitted on the 26th of October, 1861, by Quartermaster Meigs to the Secretary of War; though of course the court is free to consider it as one which has occurred to others. The judgment, however, was perhaps erroneous on other grounds.

The contract gave the War Department a right to determine the contract. The department did determine it when Secretary Cameron indorsed on the note of Quartermaster Meigs that "no further payments will be made to Major W. W. Burns on account of royalty on the Sibley tent." Stoppage of payment was the most effective form of notice to Burns. It was, perhaps, previously (on the 1st January, 1859), determined by the efflux of the time for which it was to run; Sibley not having notified to the government a con-

---

* 12 Stat. at Large, 767.          † 10 Id. 612.

trary wish on his part.   The *contract* being determined, if not on the 1st January, 1859, certainly on the 26th December, 1861, no suit lies in the Court of Claims.   The government may have acted tortiously in making tents under the patent when it had no right by contract to do so.   But for relief against such action, Congress is the body to address.

Sibley assigned to Burns no interest in the patent by the agreement of April 15th, 1858.   The assignment was made after Sibley's contract with the United States.   It could give Burns no right as against the United States; or anything but a right to call Sibley to account with him for moneys which Sibley might receive under the contract.   Burns's right was thus but an equitable right, on which no suit lies in the Court of Claims.*

By Sibley's becoming a rebel, perhaps his whole right under the patent became forfeit.   If not, certainly by being a public enemy his partnership with Burns was dissolved, and his own right under the patent suspended.   What rights then has Burns, who was no party to the contract, and who claims but under Sibley?

*Messrs. Carpenter, Hughes, Denver, and Peck, contra*

Mr. Justice FIELD delivered the opinion of the court.

Upon the facts found by the Court of Claims, we are of opinion that the contract entered into on behalf of the United States with Major Sibley, by which the government was authorized to make and procure as many of the Sibley tents as it might require, by paying the sum of five dollars for each tent, was a valid contract, and not within the prohibitions of the army regulation, number 1002.   That regulation does not apply to contracts on behalf of the United States, which require for their validity the approval of the Secretary of War.   Though contracts of that character are usually negotiated by subordinate officers or agents of the government, they are in fact and in law the acts of the secretary,

---

* Bonner *v.* United States, 9 Wallace, 156.

whose sanction is essential to bind the United States. The secretary, though the head of the War Department, is not in the military service in the sense of the regulation, but, on the contrary, is a civil officer with civil duties to perform, as much so as the head of any other of the executive departments.

It would be carrying the regulation to an absurd extent to hold it was intended to preclude the War Department from availing itself, by purchase or any other contract, of any property which an officer in the military service might acquire, if its possession or use were deemed important to the government. If an officer in the military service, not specially employed to make experiments with a view to suggest improvements, devises a new and valuable improvement in arms, tents, or any other kind of war material, he is entitled to the benefit of it, and to letters-patent for the improvement from the United States, equally with any other citizen not engaged in such service; and the government cannot, after the patent is issued, make use of the improvement any more than a private individual, without license of the inventor or making compensation to him.

In the present case there is no question of the right of Sibley to the improved conical tent. He received a patent for the improvement in April, 1856, and, by the contract with him, the United States recognized his right to it, and to compensation for its use.

The contract was nothing more, in fact, than a license from him to the government to manufacture or procure the tent, and use it, upon payment of a stipulated sum. By its terms the license extended until the 1st of January, 1859, and longer unless the United States were notified to the contrary. The power of determining this license thus remained with the patentee after that period, but the United States could also at any time have determined their liability by ceasing to make the tents. It does not appear that either party ever desired the termination of the license. Neither Sibley, nor Burns, who had become, as hereafter stated, equally interested with Sibley in the contract, ever expressed

any intention to withdraw the license; and the United States continued to make and use the tents until the whole number were obtained, for which the present claim is asserted. The order of the secretary in December, 1861, declaring that no further payments should be made to Burns on account of the royalty on the tent, was not intended, in our judgment, either as a repudiation of the liability of the United States to him for the tents previously procured, amounting to over thirty-eight thousand, or of their liability to him for any tents that might be subsequently made, but only to leave the rights of Burns, connected as they were with a patent issued to one who had resigned his commission in the National army and entered the Confederate service, to be determined by the proper judicial tribunals. If the secretary had intended to terminate the contract something more would have been required on his part, whilst the United States continued to manufacture and use the tents, than a mere direction to withhold the payments stipulated for such manufacture and use.

Burns, as we have said, had become equally interested with Sibley in the contract with the United States. In April, 1858, Sibley had executed to him an assignment of "the one-half interest in all the benefits and net profits arising from and belonging to the invention," from and after the 22d of February, 1856, a period anterior to the issue of the patent. Whether this assignment be held to have transferred a legal title to one-half of the patent itself is not, in our judgment, important. It passed a half interest in the contract of Sibley with the government, and the right to a moiety of the royalty stipulated by that contract.

The War Department recognized this half interest of Burns, and, until the order of the secretary in December, 1861, paid a moiety of the royalty to him. It thus severed his claim under the contract from that of Sibley. But independent of this fact the rights of Burns in the contract and the compensation stipulated could not be forfeited nor impaired by the disloyalty of his associate. He was true in his allegiance to the government and served in the army of the Union. His claim could, therefore, be presented and con-

sidered in the Court of Claims by the act of March 3d, 1863. His associate, Sibley, is at the same time barred by that act of any action there, either joint or several, by reason of his disloyalty. The act does thus, in fact, sever their claims, allowing the claim of one to be prosecuted and barring that of the other. The technical rule of pleading in an action in a common law court, by which a contract with two must be prosecuted in their joint names, if both are living, has no application to a case thus situated. And the Court of Claims, in deciding upon the rights of claimants, is not bound by any special rules of pleading.

We see no error in the ruling of that court, and therefore its judgment is

AFFIRMED.