FARM SECURITY ADMINISTRATION,
DEPARTMENT OF AGRICULTURE,
v. HERREN.

No. 13518.

Circuit Court of Appeals, Eighth Circuit.

Jan. 12, 1948.

Melvin Richter, Atty., Department of Justice, of Washington, D. C. (Peyton Ford, Asst. Atty. Gen., R. S. Wilson, U. S. Atty., and Charles A. Beasley, Asst. U. S. Atty., both of Fort Smith, Ark., J. Francis Hayden, Sp. Asst. to Atty. Gen., and Hubert H. Margolies, Atty., Department of Justice, of Washington, D. C., on the brief), for appellant.

Du Val L. Purkins, for appellee.

Before SANBORN, WOODROUGH, and COLLET, Circuit Judges.

WOODROUGH, Circuit Judge.

It is stated that altogether Farm Security Administration aided in forming 52 land leasing associations, including Ashley Homestead Association, Inc., here involved, leasing 136,386 acres by groups composed of 2,000 small farmers, and as this case presents the first reported case brought on the theory that the lease executed to the leasing association should be deemed to be a lease to the United States which obligates the United States to make the payments which the lessee named in the lease agreed to make, the questions presented by the claim and the judgment here supporting it have been extensively briefed for the Government. The findings of fact filed in the trial court with the judgment do not attempt to reflect the gist or substance of the whole evidence received on the trial but only certain of the circumstances of the transactions shown in evidence and all requests of the Government for findings upon the evidence offered and received in its behalf were refused. Consequently it has been necessary to consider the case actually presented by the evidence, according to the findings the weight to which they are entitled under the rules. Although the record shows that the statutes, Executive Orders, Regulations, Administrative and Directive Order establishing and defining the functions, powers and duties of Farm Security Administration and its agents acting in Arkansas relative to the transactions involved were properly brought to the Court's notice and recognized by it on the trial, it is not clear that all Executive Orders and Hearings before Congressional Committees called to our notice in the brief were also there produced. Possibly a wider perspective of the rehabilitation program of Farm Security has been accorded, but the evidence and documents brought up on the appeal have controlled our decision.

It appears that the rural rehabilitation program of the Farm Security Administration was instituted by the Government in order to alleviate the effects of the economic depression and great drought of the early 1930's. Congress in the Emergency Relief Appropriation Act of 1935, 49 Stat. 115, authorized the President to expend monies for rural rehabilitation and relief in stricken agricultural areas, and as part of that program, to make loans to finance

in whole or in part the purchase of farm lands and necessary equipment by farmers, farm tenants, croppers, and farm laborers, Sec. 1, 49 Stat. 115, 117.[3]

Executive Order 7143, dated August 19, 1935, as amended by subsequent Executive Orders and codified in the Code of Federal Regulations, at Section 301.3, Title VI, Chapter III, provided:

"(a) Loans may be made by the Farm Security Administration

"(1) for the purpose of financing, in whole or in part, the purchase of farm lands and necessary equipment by farmers, farm tenants, croppers, or farm laborers, and

"(2) for such other purposes as may be necessary in the administration of approved projects involving rural rehabilitation or relief in stricken agricultural areas.

"(b) Loans for the purposes mentioned in paragraph (a) (2) may be made by the Farm Security Adminstration either to individuals or to such bona fide agencies or cooperative associations as the Administrator shall approve: Provided, however, that such loans shall be made to such agencies or associations only upon condition (1) that they impose no inequitable restrictions upon membership or participation therein, and (2) that they be so conducted under the supervision of the Farm Security Administration as to protect adequately the interests of the members or participants therein."

Pursuant to this authority, the Administrator of the Resettlement Administration issued Administration Order 40 (Revision 2), dated September 26, 1936, prescribing the rules and regulations governing his agency with respect to the classes of loans which it would make in connection with bona fide cooperative associations, the procedure to be followed, the purpose thereof, eligibility requirements and general policies.[4]

It was brought out at the Hearings before the Select Committee of the House Committee on Agriculture to Investigate the Activities of the Farm Security Administration, 78 Cong. 1st Sess., pursuant to H.Res. 119, pp. 982, 984, that in the course of the administration of the program of the above administration order, it became obvious to the Farm Security Administration that what the stricken farmer needed was assistance in planning his operations and the necessary credit to carry out his plans

---

[3] Congress in the Emergency Relief Appropriation Act of 1935, 49 Stat. 115, and following Emergency Relief Appropriation Acts authorized the President of the United States to make loans to low-income farmers in stricken agricultural areas (Sec. 1); to acquire by purchase or by eminent domain any real property or any interest therein (Sec. 5); to establish the necessary agencies for the performance of these functions (Sec. 4); and to prescribe rules and regulations for their operation (Sec. 6). The President issued over a period of time a number of Executive Orders creating and putting into operation the Resettlement Administration, to which he delegated this authority. See Executive Order 7027, dated April 30, 1935; Executive Order 7028, dated April 30, 1935; Executive Order 7041, dated May 15, 1935; Executive Order 7083, dated June 24, 1935; Executive Order 7143, dated August 19, 1935; Executive Order 7200, dated September 26, 1935; Executive Order 7347, dated April 15, 1936, 1 F.R. 207; Executive Order 7396, dated June 22, 1936, 1 F.R. 651; Executive Order 7530, dated December 31, 1936, 40 U.S.C.A. § 431 note, 2 F.R. 7. Executive Order 7027 established the Resettlement Administration and authorized the Administrator thereof to "acquire, by purchase or by the power of eminent domain, any real property or any interest therein and improve, develop, grant, sell, lease (with or without the privilege of purchasing), or otherwise dispose of any such property or interest therein." By Executive Order 7530, supra, the property, function, and duties of the Resettlement Administration were transferred to the Secretary of Agriculture and the Administrator of the Resettlement Administration was made subject and amenable to the Secretary of Agriculture. By Secretary's Memorandum 732, dated September 1, 1937, 2 F.R. 1800, the Resettlement Administration was changed to the Farm Security Administration.

[4] When Resettlement Administration was changed to Farm Security Administration, this order was re-numbered FSA Instruction 831a, and was operative until declared obsolete on June 18, 1942.

rather than advances of funds simply to meet the emergencies with which his family was faced. Accordingly, Farm Security undertook as part of the rural rehabilitation loan program to render the assistance and supervision the farmers needed. The Farm Security Administration sought to enable a low income farmer to obtain not only the information and methods developed by the college of agriculture experiment station and the Department of Agriculture, and to obtain assistance in relating this information and experience to his problems and at the same time funds were loaned with which to put such solution in operation.

Executive Order 7143 authorized loans of two general categories: (1) loans to individuals and (2) loans to associations. As to the loans to associations, Farm Security found that frequently the rehabilitation of individual farmers in certain areas was impossible because adequate land resources were not available. One of the main reasons was that the land was owned and operated in fairly large tracts and the landowners were unwilling to break up the tracts piece by piece and make individual units available to several different small farmers. To overcome this obstacle, Farm Security developed the "land-leasing program," the purpose of which was to make it possible to assist a large number of low-income farmers. This program was to aid small farmers in obtaining access to such farm land under a secure lease by helping them establish an association which could lease the entire large tract and then sublease individual family-type farms to the members. See Hearings 1001–1002; Herren v. Farm Security Administration, etc., 8 Cir., 153 F.2d 76, 79, fn. 3. This was done by helping the landowner and the farmers draw up a lease containing protective provisions for both parties and usually running for a period of 5 to 10 years. Farm Security then made a loan to the association to enable it to pay a year's rent in advance and aided the association in subleasing to individual low-income farmers. Local supervisors helped the farmers draw up their individual farm plans, and where necessary, made regulation rehabilitation loans to each farmer. They also assisted the group in handling the limited business of the association. The land-leasing associations attempted to make it possible for these farmers to operate an adequate family type farm for a number of years continuously so that they could build up livestock enterprises, work out crop rotation plans, grow sizeable gardens, and get into a diversified type of agriculture. It was in this manner that Farm Security sought to discharge its task of rehabilitating low-income farmers, a task which it had recognized as being in many instances as much of an educational task as financial. But there was no evidence that the Secretary of Agriculture ever authorized the creation of land-leasing corporations by government officials or by Farm Security. That was no part of the rehabilitation plan, though such officials did advise and assist the farmers themselves to organize such corporations. The several officers of Farm Security who testified in this case reflected their understanding of this plan of operation in the territory where they worked, including Arkansas, and their adherence to it.

The court is not called on here to pass on whether the program of Farm Security so adopted and carried on over the course of years was as intended by Congress or not, but the existence of it as fully established must be recognized in order to get at the actual intention in particular transactions that were part of the operation of the program.

Ashley Homestead Association, Inc., the named lessee of the Herren property, was one of the land-leasing associations which Farm Security helped small farmers to incorporate and establish. It was incorporated on January 20, 1939, almost a year prior to the signing of the lease here involved, as a benevolent corporation under Secs. 2252–2261 of the Statutes of Arkansas, Pope's Digest 1937. It was a corporate entity, separate and distinct from Farm Security. Its purpose, as stated in Articles of Association, was "to rehabilitate and render self-supporting the families of its members (rural families of low income) by assisting or participating in the establishment, leasing, development and maintenance of farms, homes and other facil-

ities, including necessary or appropriate cooperative and community facilities and enterprises, for such families on the lands now or hereafter leased or owned by this Association; * * *." No employee of Farm Security was among the incorporators of the Association. The Articles of Association and the bylaws, in addition to the usual provisions, provided that the members of the board of directors need not be members of the Association. Three employees of Farm Security were on the board of directors for a period, but that was to assist the association in conducting its affairs from an educational standpoint and also to protect the interests of the Government. These directors, when present at meetings, participated as advisors or as consultants. As shown in the minutes of the various meetings in evidence the number was reduced to one by 1943, and thereafter the practice of having an employee of the Farm Security Administration on the board of directors was discontinued.

Two loans were made to Ashley, one on February 4, 1939, in connection with the lease of a farm referred to as the Wells farm; the other on May 7, 1940, in connection with the lease of the Herren property. These loans were processed in accordance with the procedures established in Administration Order 40 (revision 2) for the loaning of money to cooperative associations.[6] These loans were made only after (1) Ashley had submitted applications therefor, which applications were accompanied by numerous exhibits to show that Ashley was a bona fide cooperative association, complying with the requirements of the Secretary of Agriculture [7]; (2) an economic justification had been prepared; (3) the loan approved by the Administrator of Farm Security and the Secretary of Agriculture; and (4) authority given to the Regional Director to execute the loan agreement on behalf of the Secretary of Agriculture.[8] Loan agreements between the United States and Ashley were then executed and mortgage notes in favor of the United States were signed by the Association; a chattel mortgage was executed by the Association to the United States on July 6, 1940 and filed for record with the Clerk of the Circuit Court and Ex-officio Recorder.

As a condition of these loans the Association was required to deposit its funds in banks approved by Farm Security, which funds were not to be withdrawn without the countersignature of such person or persons as the Government may from time to time designate. Further conditions of the loan related among other things to the filing of reports, conditions of membership, voting of members, keeping of books which were to be available for Government inspection. The Association also agreed to "con-

---

[6] Administration Order 40 authorized loans to "approved community and cooperative associations ＊ ＊ ＊ to ＊ ＊ ＊ further rural rehabilitation or relief in stricken agricultural areas ＊ ＊ ＊ for the following purposes: I. To acquire property, real or personal, or any interest therein necessary for the proper conduct of the enterprise. ＊ ＊ ＊ III. To provide necessary operating capital ＊ ＊ ＊."

[7] Defendant's Exhibit 14 included the Association's application for loan in connection with the lease on the Wells property to which were attached Ashley's Articles of Association; its bylaws; a resolution of the incorporators authorizing its president and treasurer to apply for a loan from the United States; a waiver of notice of first meeting of the incorporators; the minutes of that meeting at which the bylaws, form of application for membership, and the resolution authorizing the loan application were adopted; a waiver of notices of the first meeting of the Board of directors; the minutes of that meeting, electing officers, requiring the treasurer to file a bond, authorizing the loan application and the execution of the lease on the Wells property. It was stipulated that the same general procedure was followed in loaning money to Ashley on the Herren tract.

[8] In this regard, it may be noted that Mr. Reid's request for authority to sign the lease also requested authority to "sign loan agreement on behalf of the Government and take all steps preparatory to release of loan funds to the Association;" and that the answering telegram which authorized the approval of the lease withheld authority as to the loan agreement pending approval of the economic justification.

duct and manage its affairs in accordance with such policies as the Government may from time to time prescribe and deem necessary for the protection of the Government's interests thereunder." The loan agreement further provided (Paragraph IX) that if the Association failed to live up to the terms of the agreement—a contingency which did not occur—the Government could take over and actively manage the corporation.

The supervision exercised by Farm Security was entirely consistent with policies of the rural rehabilitation program and with the conditions of the lending and supervision of the loan. Farm Security not only loaned money to the Association as a leasing association, but also to Ashley's members on a personal basis. In connection with these loans, the farm supervisor would sit down with the farmer and discuss his crop plans and his plan of operation. These loans were made on the basis of the Farm Management plan which specified the use of all funds involved in the loan. Farm Security had an interest in seeing that the Association was organized and functioned properly so that it would render the service it had been designed to render and that the loan Farm Security had made would be protected and repaid. The various members of the Association were semi-literate or illiterate people, unaccustomed to the responsibilities inherent in the operation of such a project, and they required supervision and guidance for the enterprise and in the conduct of their affairs in order that it be a success. Passing on applications for membership by the Farm Security Administration was required in order to assure that Ashley conformed to the conditions imposed by Executive Order 7143 for the loaning of money to such associations. The countersigning of checks by the Farm Security Administration was required to assure against the dissipation of the Association funds. Such practices are not uncommon where the creditor's only interest in his debtor is in the repayment of the obligation; here Farm Security had not only that interest but the additional interest in that it was working for success of the association's enterprise. It was necessary for officers of Farm Security to be actively conversant with the handling of the corporate internal affairs of Ashley because Ashley's members had no familiarity with the forms and procedures relating to corporate records or management, and it is for this reason that initially there were Farm Security employees on the Ashley board of directors. The testimony of Farm Security officers was that: "The only purpose in ever having them on there was realizing the fact that the Association gave a loan agreement to the government which was for the protection of the government's interest, and realizing that these farmers were not versed in carrying on the affairs of the association, it was fully justified under the loan agreement, until they could have some training in carrying on their own affairs."

It appeared to the trial court as stated in its findings, that the Farm Security officers "managed" the Herren farm, that "Farm Security" took possession of and operated it, "managed and controlled the affairs of the Association," which "was at all times under control and domination of Farm Security" and that "in the eyes of the law" Farm Security Administration was "the real lessee of the land." But it did not relate such conclusions to the proven program in operation and the purposes of Farm Security or to the real controversy in the case. Plaintiff's action is not to impose a liability upon the United States for a conversion of the plaintiff's property to its own use, but the burden was on the plaintiff suing under the Tucker Act to prove that the United States contracted to pay the money sued for, as is later discussed.

Our examination of the record has not disclosed any action taken by Farm Security or its agents in respect to the organization of Ashley under the laws of Arkansas, the execution by Mrs. Herren and the Southwest Joint Stock Land Bank as lessors, of the lease of the land to Ashley, the loaning of money to Ashley and to its members and the supervision and control exercised throughout the period of the transaction until Ashley had fully repaid its loans to the United States, which was not entirely in accord with the government's interest in the loans it made and in the success of its rural rehabilitation program. We find no evidence that the supervision by

Farm Security was intended to go beyond the protection of those interests. The loan agreement with Ashley expressly provided the only condition upon default by Ashley in which Farm Security was granted the right to take over the Association's property and that condition did not arise. There was no evidence that Farm Security or the United States intended to agree to pay rent or damage from waste on the farm, the trial court made no finding that there was such intention in fact.

It must be held accordingly that there was no proof of a contract of Farm Security or of the United States to pay for the waste suffered on the Herren land within the meaning of the Tucker Act.

That Act, 28 U.S.C.A. § 41(20) provides for jurisdiction in the District court of the United States in suits against the United States:

"Concurrent with the Court of Claims, of all claims not exceeding $10,000 founded upon the Constitution of the United States or any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect to which claims the party would be entitled to redress against the United States, either in a court of law, equity, or admiralty, if the United States were suable * * *."

Nothing in the record would support a finding that there was a meeting of minds between Farm Security or the United States and Mrs. Herren that the United States would pay what Ashley agreed to pay in the case. United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058; State of Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235; United States v. Minnesota Mut. Investment Company, 271 U.S. 212, 46 S.Ct. 501, 70 L.Ed. 911; Goodyear Tire & Rubber Co. v. United States, 276 U.S. 287, 48 S.Ct. 306, 72 L.Ed. 575; Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099, 19 A.L.R. 403; Merritt v. United States, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643; United States v. Algoma Lumber Company, 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260; Baltimore & Ohio R. Co. v. United States, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816.

*The Lease Sued on.*

In addition to what has been said, other considerations against the judgment have been urged for the government which appear meritorious. Inspection of the terms of the written lease to the Association on which the plaintiff has sued shows that Ashley Homestead Association, Inc., was separate and distinct from Farm Security or the United States, and that the United States did not undertake to lease the land or assume the lessee's obligations. Thus in the document of lease the association is designated "Lessee"; "the Lessors hereby lease to the Lessee and the Lessee hires from the Lessors the following described real estate located in Ashley County, Arkansas, viz."; the lease mentions the United States in only a few places. The first is in the enumeration of the parties to the lease, and there it is specifically stated that the lease and option to purchase was being made "between Mrs. Gordie M. Herren, a widow whose address is Portland, Arkansas, and the Southwest Joint Stock Land Bank of Little Rock, Arkansas (hereinafter called the 'Lessors'), and Ashley Homestead Association, Inc., a corporation organized and existing under the laws of the State of Arkansas (hereinafter called the 'Lessee'), and The United States of America, acting by and through the Secretary of Agriculture (hereinafter called the 'Government')." This description of the parties to the lease points out clearly that Ashley Homestead Association, Inc., "the Lessee," was separate and distinct from the United States. The other places in the lease mentioning the United States demonstrate the separateness of the United States and Ashley.

The United States is again mentioned in Paragraph 5; subparagraph (a) of that paragraph provides that "the Government or the lessees * * * shall have an exclusive and irrevocable option, at any time prior to December 31, 1941, to purchase said property upon the following terms and conditions, * * *," whereas subparagraph (b) vests in the United States in case it exercises the option, "the right to terminate this lease as to the end of any calendar

year by giving written notice of such termination to the Lessee at least ninety (90) days before the end of such year * * *." Further mention of the United States appears in Paragraph 10, subparagraph (a) of which permits the Lessee to sublet all the property to any tenant "upon first receiving the written consent of the Government thereto," and subparagraph (b) permits the Lessee to sublet any part of the property "without first receiving consent of the Government." Paragraph 11(b) obligated the Lessors to furnish the Lessee "with evidence of title in it satisfactory to the Government," whereas Paragraph 12 provided "All rights, privileges, benefits, options and powers conferred herein on the Government may be exercised on its behalf by the Secretary of Agriculture, or by the head of any other agency of the Federal Government that may from time to time be vested with authority over the subject matter of this lease, or by the duly authorized representative of either of them."

If Ashley Homestead Association, Inc., were a contractual designation, or an agent, for the United States and if the Government had intended to assume the obligations of the lease, there would have been no purpose in preparing the lease in the form in which it was executed and in distinguishing so carefully between the United States and Ashley; for each time the United States is mentioned in the lease, it is in order to give it rights which were separate and distinct from those of Ashley's. For instance, there would have been no purpose in reserving two separate options to purchase the property, one for the United States and one in favor of Ashley, nor would there have been any purpose in making Ashley's right to exercise its option dependent on the approval of the Government, since if it were intended that Ashley be a contractual designation, or agent, for the United States, a reservation of a single unconditional option in favor of the lessee would have been sufficient. In addition, there would not have been any purpose in reserving the right to the United States, once it has exercised its option, to terminate the lease on 90 days' notice, for if Ashley were its contractual designation, and the United States and Ashley were one

and the same, the purchase of the property by the United States would have merged the lease with the title. There would then have been no lease separate from the title —nothing which the United States could terminate by exercise of this reserved right. Furthermore, there would have been no need to condition the subletting of all the property upon the written consent of the United States nor to permit the leasing of any part thereof with the consent of the United States.

Accordingly, it is clear from the face of the lease that the United States did not intend to bind itself thereon as the lessee, but was interested only in securing an option to purchase the property, and to assure that Mrs. Herren had a proper title to the property. And it is a well-established principle of contract law that those who are parties to a contract and are bound by it are to be ascertained by an inspection of the document and its provisions are controlling in the absence of some positive rule of law or provision of statute requiring them to be disregarded. United States v. Algoma Lumber Co., 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260, involved the question whether certain contracts for the sale of timber on land of the Klamath Indian Reservation, executed by the Superintendent of the Klamath Indian School, by authority of an Act of Congress, are contracts of the United States upon which the United States was suable. In holding that the action could not be maintained against the United States, the Supreme Court said (305 U.S. 421, 422, 59 S.Ct. 271, 83 L.Ed. 260):

"Neither the United States nor any officer purporting to act on its behalf is named a party to the contract. By its terms the contract is declared to be entered into 'between the Superintendent of the Klamath Indian School, for and on behalf of the Klamath Indians, party of the first part' and the Lumber Company, 'party of the second part.' * * * In this, as in any other case of a written contract, those who are parties to and bound by it are to be ascertained by an inspection of the document, and its provisions are controlling in the absence of some positive rule of law or provision of statute requiring them to be disregarded."

See also, Waterman Steamship Co. v. Land, 80 U.S.App.D.C. 167, 151 F.2d 292, 296, reversed on other grounds sub nominee Macauley v. Waterman Steamship Co., 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839; Anson on Contracts (Corbin's 3rd Ed.1919) § 275 et seq.; cf. Hodgson v. Dexter, 1 Cranch 345, 2 L.Ed 130.

A further consideration which precludes any recovery by Mrs. Herren against the United States is that no employee of Farm Security Regional Office VI was authorized to lease her property on behalf of the United States either in its name or in the name of Ashley Homestead Association.

There is no question that by Executive Orders the President of the United States had, pursuant to the authority vested in him by various Emergency Relief Appropriation Acts, empowered the Secretary of Agriculture of the United States, to lease land in the name of the United States for the purpose of rural rehabilitation. But that authority was vested in the Secretary of Agriculture; he retained that authority in himself and did not delegate it generally to the Administrator of the Farm Security Administration, the agent ultimately charged with the administration of that program, or to its Regional Directors. This is clear from Memorandum 715 of the Secretary of Agriculture which stated:

"Pursuant to authority delegated to me in Executive Order No. 7530 of December 31, 1936, as amended, it is hereby ordered that—

"1. All authorization, delegations of authority, and procedures heretofore issued or approved by the Administrator of the Resettlement Administration are hereby confirmed with the exception of the following functions:

\* \* \* \* \* \*

"d. To sign Administration orders which establish policy or delegate authority.

\* \* \* \* \* \*

"s. To sign all formal contracts, except contracts which the Administrator of the Resettlement Administration is authorized to sign under Memorandum No. 710 and contracts which officers of the Resettlement Administration are authorized to sign un-

der existing procedures of that Administration.

\* \* \* \* \* \*

"w. To lease lands in the name of the United States of America for the life of the vendor."

In the present case, the lease is not signed by the Secretary of Agriculture but in his name for and on behalf of the United States by T. Roy Reid, Regional Director, Regional Office VI, Farm Security Administration. Mr. Reid signed the lease pursuant to telegraphic authorization which read:

"You are hereby authorized to approve on behalf of the Government the lease between the Ashley Homestead Association and the landlord. You are advised that funds in the amount of seven thousand dollars have been earmarked pending submission and approval of complete revised economic justification covering original and proposed supplemental loans. Upon approval of revised economic justification by this office, you will be authorized to execute loan agreement for supplemental loan and to take all other steps necessary to release the funds to the association."

This authorization was sent pursuant to the request therefor by Mr. Reid and must be read in light of that request, which stated:

"Mr. W. W. Alexander

"Administrator, Farm Security Administration

"Washington, D. C.

"Ashley County Homestead Association desires additional loan from Government to take lease with option to purchase from Mrs. Gordie A. Herren. Loan requested $4750. $2500 for rental to be repaid at end of fifth year, $1250 for rental reserve to be repaid at end of fifth year and $1000 for operating capital to be repaid in 10 equal annual installments of principal and interest. Lease for five years, first 4 years' rental to be paid annually in advance, fifth year's rental to be paid at termination of lease, lessee to receive 5% discount on all rental paid in advance. Acreage to be determined by AAA measurement. Lessor to charge no rental for flooded acreage, to pay taxes, restore any building rendered unten-

antable by casualty, to place property in good repair, to make specific repairs and pay mortgage debts on property. Lessee to have right to do those things if lessor fails to do them and deduct from rental. Lessee and Government, both parties to lease to have five years' option to purchase. Lessee to exercise such option only with consent of Government. If Government exercises option it may terminate lease and lessee may credit against debt to Government advance rental for unexpired period. Lessor waives liens in regard to crops or any property added by lessee. Lessor to furnish evidence of title and no rental to be paid until Government has made finding that lessor has title sufficient to support the lease and has right to make lease. Lessor to warrant title. Lessor to agree to save lessee harmless because of defect in title. Request telegraphic authority to sign lease on behalf of Government, to make finding of lessor's title and right to make lease, sign loan agreement on behalf of Government and take all steps preparatory to release of loan funds to the association.

"T. Roy Reid, Regional Director."

Pursuant to that authorization, Mr. Reid signed the lease, not as Ashley Homestead Association, or in the name of that association, but rather in the name of the then Secretary of Agriculture, for and on behalf of the United States. The lease was signed for Ashley Homestead Association, Inc., by Charlie McCuin, as president thereof, and attested by Mance Cockrell, as its secretary; there is nothing in the record to indicate that either Mr. McCuin or Mr. Cockrell was employed by the Farm Security Administration or that either of them was authorized by the Secretary of Agriculture to sign the lease on behalf of the United States in the name of Ashley Homestead Association Inc.

■ The telegram did not authorize Mr. Reid or any one else to bind the United States as lessee of the property, and the record is completely devoid of any other delegation to Mr. Reid or any one else of authority to bind the United States under that name, or as Ashley Homestead Association, Inc., as lessee on the Herren property. This is an additional reason why the United States cannot be held liable on the lease. For it is well established that persons dealing with an agent of the United States are charged with notice of the limitation on his authority and that the United States is bound only on the acts of an agent which are within his authority. Federal Crop Insurance Corp. v. Merrill, 68 S.Ct. 1; Wilber National Bank v. United States, 294 U.S. 120, 123, 55 S.Ct. 362, 79 L.Ed. 798; Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791; United States v. City & County of San Francisco, 310 U.S. 16, 32, 60 S.Ct. 749, 84 L.Ed. 1050; Filor v. United States, 9 Wall. 45, 19 L.Ed. 549; United States v. Burns, 12 Wall. 246, 20 L.Ed. 388; Whiteside v. United States, 93 U.S. 247, 23 L.Ed. 882; United States v. North American Transp. & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935; United States v. Chickasha Cotton Oil Co., 10 Cir., 115 F.2d 135. This limitation on the authority of an agent to bind the United States applies not only to express contracts but contracts implied in fact as well. As to the latter situation, the Supreme Court has said: "The limitation upon the authority to impose contract obligations upon the United States is as applicable to contracts by implication as it is to those expressly made." Sutton v. United States, 256 U.S. 575, 580, 41 S.Ct. 563, 565, 65 L.Ed. 1099, 19 A.L.R. 403; Bradley v. United States, 98 U.S. 104, 113, 114, 25 L.Ed. 105; Baltimore & Ohio R. Co. v. United States, 261 U.S. 592, 596, 43 S.Ct. 425, 67 L.Ed. 816.

■ Another point made for the Government against the judgment is well taken, namely; that the corporate entity of Ashley Homestead Association, Inc., may not be pierced to impose liability on the United States under the Tucker Act for the breach of the lease. The District court in effect disregarded the corporate entity of the Association in order to impose liability on Farm Security but the fact that the Association was a duly and legally constituted separate corporate entity presents an insuperable obstacle to the imposition of 'ability on the United States. Contrary to the theory of plaintiff's case, piercing the corporate veil of Ashley to find it an instru-

mentality of the United States does not support a finding of a contract, express or implied in fact, with the United States. The principles governing the piercing of the corporate veil are broad equitable principles and it is not done by the courts in order to reach and impose liability upon some one who has agreed to pay either by actual promise or one implied in fact, but rather upon some one behind the contracting corporation who ought to pay but has avoided making any agreement to do so, express or implied in fact. Hence whatever propriety may arise to pierce the corporate veil in those cases where it is sought to reach some one other than the United States it may not be done in order to impose Tucker Act liability on the United States. No case has been cited where a court has done so, and our study of the cases in which corporate veils have been pierced and third persons subjected to liability for the obligations of their corporation has convinced that the court was in error here in attempting to pierce the corporate entity of the Homestead Association to impose the obligation of the agreements of the Association upon the United States. The court was required to recognize the separate existence of the Association as it was proven and such recognition does not tend to aid in the consummation of or sanction any fraud or wrong but is in accord with law.

The whole record here has convinced that there was no evidence to support the claim that there was a contract express or implied in fact, between Mrs. Herren and the United States; that the sole relationship shown between Farm Security and the Association was that of debtor-creditor and that Farm Security exercised supervision over the affairs of Ashley to protect loans to Ashley and to Ashley's members, and to further its rehabilitation program; that the lease by its terms established the relative obligations of the parties to it and that no employee of the government was either authorized to or undertook to bind Farm Security or the United States to make the payments promised by the Ashley Association in the lease.

The judgment appealed from is accordingly reversed with directions to dismiss.