# IN THE COURT OF APPEALS OF IOWA

No. 17-1118
Filed November 7, 2018

**ERIC N. LUCY,**
         Plaintiff-Appellee/Cross-Appellant,

**vs.**

**PLATINUM SERVICES, INC., now known as PLATINUM SUPPLEMENTAL INSURANCE, INC., and WAYNE BRIGGS,**
         Defendants-Appellants/Cross-Appellees.
_____

        Appeal from the Iowa District Court for Dubuque County, Monica L. Wittig,

Judge.


        Defendants appeal and plaintiff cross-appeals the district court's ruling on

summary judgment.   **AFFIRMED ON APPEAL; REVERSED ON CROSS-**

**APPEAL.**



        Kevin J. Visser, Paul D. Gamez, and Thomas D. Wolle of Simmons Perrine

Moyer Bergman PLC, Cedar Rapids, for appellants.

        Christopher C. Fry and McKenzie R. Hill of O'Connor & Thomas, P.C.,

Dubuque, for appellee.



        Considered by Doyle, P.J., and Tabor and McDonald, JJ.

**McDONALD, Judge.**

Eric Lucy filed this declaratory judgment action against his former employer, Platinum Services, Inc., and Platinum's majority shareholder, Wayne Briggs. Lucy sought a declaration of his rights under two contracts—one between Lucy and Platinum and one between Lucy and Briggs. At issue in the contract between Lucy and Platinum was the enforceability of a seven-year covenant not to compete. At issue in the contract between Lucy and Briggs was Lucy's entitlement to payment under the terms of a stock purchase agreement pursuant to which Lucy sold his minority stake in Platinum to Briggs. Lucy filed a motion for summary judgment. With respect to the first contract, the district court concluded the covenant not to compete was "unreasonable and too restrictive as it is written" and "[t]he acceptable period of restriction is therefore limited to the two-year period subsequent to Lucy's termination of employment." With respect to the second contract, the district court concluded Briggs was entitled to terminate payment in the event Lucy violated the covenant not to compete contained in the first agreement. Platinum and Briggs timely filed this appeal, challenging the district court's ruling on the covenant not to compete. Lucy timely filed this cross-appeal, challenging the district court's conclusion Briggs was entitled to terminate payment under the stock purchase agreement in the event Lucy violated the terms of the covenant not to compete.

The standard of review in a declaratory judgment action is dependent on whether the action was brought in equity or at law. *See Boelman v. Grinnell Mut. Reinsurance Co.*, 826 N.W.2d 494, 500 n.1 (Iowa 2013). Because this dispute was resolved on summary judgment, our review is for correction of errors at law.

*See id.* at 500 & n.1. Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). The party seeking summary judgment has the burden of establishing that the facts are undisputed and that the "party is entitled to a judgment as a matter of law." *See Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 677 (Iowa 2004) (quoting Iowa R. Civ. P. 1.981(3)). "When a motion for summary judgment is made and [properly] supported . . . [the opposing] party may not rest upon the mere allegations or denials of the pleadings." Iowa R. Civ. P. 1.981(5); *Bitner v. Ottumwa Cmty. Sch. Dist.*, 549 N.W.2d 295, 299 (Iowa 1996). Instead, the resisting party must set forth specific material facts, supported by competent evidence, establishing the existence of a genuine issue for trial. *See* Iowa R. Civ. P. 1.981(5); *Bitner*, 549 N.W.2d at 299. "A fact is material if it will affect the outcome of the suit, given the applicable law." *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 543 (Iowa 2006). An issue of fact is "genuine" if the evidence would allow "a reasonable jury [to] return a verdict for the nonmoving party." *Fees v. Mutual Fire & Auto. Ins. Co.*, 490 N.W.2d 55, 57 (Iowa 1992). It is well established that "[s]peculation is not sufficient to generate a genuine issue of fact." *Waddell v. Univ. of Iowa Cmty. Med. Servs., Inc.*, No. 17-0716, 2018 WL 4638311, at *3 (Iowa Ct. App. Sept. 26, 2018) (quoting *Nelson v. Lindaman*, 867 N.W.2d 1, 7 (Iowa 2015)). "[S]ummary judgment is correctly granted where the only issue to be decided is what legal consequences follow from otherwise undisputed facts."

*Budny v. MemberSelect Ins. Co.*, No. 16-1189, 2017 WL 104964, at *2 (Iowa Ct. App. Jan. 11, 2017).

The summary judgment record reflects the following. Briggs formed Platinum in 1995. Platinum sells supplemental health insurance. Lucy joined Platinum in 1996 as a salesperson and ascended the company ladder over time. In an effort to assure management and ownership continuity, on January 1, 2002, Platinum granted Lucy stock in the company amounting to a ten percent interest in Platinum.

In conjunction with the award of stock, Lucy and Platinum entered into a Combined Cross-Purchase and Redemption Agreement ("Redemption Agreement"). The agreement specified it was "entered into . . . by and among Eric N. Lucy ("Lucy"), and Platinum Services, Inc., an Iowa business corporation . . . ." The Redemption Agreement contained several terms dictating the terms and conditions of any future sale of Lucy's shares. Article two of the Redemption Agreement required Lucy to give Platinum the right of first refusal should Lucy elect to sell his shares. In the event Platinum declined to purchase Lucy's shares, the other shareholders were granted the right to purchase Lucy's shares on a pro-rata basis based on their share percentage ownership. Section 2.2,[1] entitled "Rules Governing Stock Purchases," stated: "If any [s]hares are to be purchased by the *Corporation* pursuant to this [a]rticle 2, the following rules will apply: . . . The purchase price of each [s]hare will be paid in accordance with [section] 5.3 of this

---

[1] The Redemption Agreement inadvertently has two sections numbered 2.2. This opinion's references to section 2.2 refer to the section entitled "Rules Governing Stock Purchase."

[a]greement." (Emphasis added.) Article five provided the manner for determining a purchase price per share and the manner of payment. Section 5.3(a) required "[t]wenty percent (20%) of the purchase price of [s]hares being purchased and sold under this [a]greement will be paid in cash upon the effective date (the "Closing") of the purchase and sale." Section 5.3(b) stated: "The unpaid balance of the purchase price, if any, will be evidenced by a negotiable promissory note payable in 60 consecutive equal monthly installments, with the first payment due one month after the [c]losing. The note shall be made by the Corporation to the order of the [s]eller . . . ."

The Redemption Agreement also contained a covenant against competition. Section 9.2(a) stated:

> During Lucy's employment and continuing through the period ending two years after the later to occur of (x) Lucy ceasing to be employed by Corporation; or (y) after Lucy is paid in full for his shares as provided in [a]rticle 5 (the "Restriction Period"), Lucy shall not, directly or indirectly, compete with Corporation within the geographic area described by a centering circle having a radius of 150 miles of: (i) Corporation's presently-existing offices, (i.e., Dubuque, Iowa); and (ii) any other office or branch offices operated by Corporation. For purposes of this paragraph, competition shall include . . . providing services or engaging in business similar to Corporation's business.

Section 9.8 conditioned Lucy's right to installment payments, stating: "Lucy's rights to payments pursuant to [section] 5.3(b) above are contingent upon Lucy complying with the covenants of this [a]rticle 9. A breach of [a]rticle 9 by Lucy will, in addition to other remedies provided herein, cause payments owed pursuant to [s]ection 5.3(b) to cease."

Lucy continued to work for Platinum and was made vice president of sales in 2004. In 2013, Lucy sought to sell his shares. Briggs agreed to purchase Lucy's

shares for $3 million, with an initial payment of $600,000 and the remaining $2.4 million to be paid in monthly installments over sixty months. To formalize and execute the agreement, Lucy and Briggs entered into a Stock Purchase Agreement ("SPA") on June 28, 2013. The SPA specified it was "made and entered into . . . by and between Eric N. Lucy and Wayne A. Briggs." The terms and conditions of payment set forth in the SPA regarding Briggs' payment obligations to Lucy were similar to the terms and conditions of payment set forth in the Redemption Agreement regarding the corporation's payment obligations to Lucy in the event the corporation had purchased the shares. The SPA did not expressly incorporate any terms of the Redemption Agreement. Although Lucy sold his stock to Briggs, he continued to work for Platinum through December 31, 2014. Lucy filed his petition for declaratory judgment in August 2016 seeking to determine his rights and obligations under the Redemption Agreement and SPA.

With that background, we turn to the merits of the issues presented. The law regarding the interpretation and construction of contracts is well established. When reviewing a contract, we must remember "[a] writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." *Jeffries v. Gen. Cas. Ins. Cos.*, No. 14-0032, 2015 WL 1046170, at *2 (Iowa Ct. App. Mar. 11, 2015) (quoting Restatement (Second) of Contracts § 202 (Am. Law Inst. 1981)). "Generally, when we interpret contracts, we look to the language contained within the four corners of the document." *DuTrac Cmty. Credit Union v. Radiology Grp. Real Estate, L.C.*, 891 N.W.2d 210, 216 (Iowa 2017). "If a contract is not ambiguous, it will be enforced as written." *Thornton v. Hubill, Inc.*, 571 N.W.2d 30, 33 (Iowa Ct. App. 1997) (citing *Spilman v. Bd. of Dirs.*, 253 N.W.2d

593, 596 (Iowa 1977)). "If the language of the contract is ambiguous, then we engage in interpretation in order to determine 'the meanings attached by each party at the time the contract was made.'" *DuTrac Cmty. Credit Union*, 891 N.W.2d at 216 (quoting *Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 615 (Iowa 2006)). A contract is ambiguous if more than one interpretation is reasonable. *See Thornton*, 571 N.W.2d at 33. "To the extent necessary to reveal the parties' intent, extrinsic evidence is admissible." *DuTrac Cmty. Credit Union*, 891 N.W.2d at 216.

"In the construction of written contracts, the cardinal principle is that the intent of the parties must control, and except in cases of ambiguity, this is determined by what the contract itself says." Iowa R. App. P. 6.904(3)(n); *Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011). Generally, "[t]he construction or legal effect of a contract is always a matter of law to be decided by the court, as is the interpretation or meaning of contractual words unless it depends on extrinsic evidence or a choice among reasonable inferences from extrinsic evidence." *Campbell v. Mid-Am. Constr. Co. of Iowa*, 567 N.W.2d 667, 669-70 (Iowa Ct. App. 1997) (citing *Connie's Constr. v. Fireman's Fund Ins.*, 227 N.W.2d 207, 210 (Iowa 1975)). "Our task is to determine the intent of the parties as evidenced by the language of their agreement[s]" and to enforce the agreements as written. *See Thornton*, 571 N.W.2d at 33. It is not our task to go beyond the plain language of the agreements to construe them to mean something the parties wish they would have said in hindsight.

We conclude the Redemption Agreement and the SPA are unambiguous and the parties' rights and obligations under the same can be declared as a matter

of law. We first consider the issue of whether Lucy is entitled to continued payment for his shares in the event he were to breach the terms and conditions of the covenant not to compete. Platinum and Briggs argue Briggs' obligation to continue payment for Lucy's shares is contingent upon Lucy's compliance with the covenant not to compete. In support of this argument, Platinum and Briggs rely on section 9.8 of the Redemption Agreement. That section provides "Lucy's rights to payments pursuant to [section] 5.3(b) above are contingent upon Lucy complying with the covenants of this [a]rticle 9. A breach of [a]rticle 9 by Lucy will, in addition to other remedies provided herein, cause payments owed pursuant to [s]ection 5.3(b) to cease." Lucy argues this provision is inapplicable and his right to receive continued payments from Briggs is not contingent upon compliance with the restrictive covenant. We conclude Lucy has the better of the argument.

Under the plain language of the parties' agreements, section 9.8 of the Redemption Agreement is inapplicable here. First, the Redemption Agreement and the SPA are separate and distinct agreements. The Redemption Agreement does not incorporate by reference any future stock purchase agreements or identify any person as an intended beneficiary of the agreement. The SPA does not incorporate by reference the Redemption Agreement, nor does it identify Platinum as an intended beneficiary of the SPA. We will not construe the documents as part of a single transaction with cross-enforcement provisions when the parties did not contract for the same. *See Longfellow v. Sayler*, 737 N.W.2d 148, 154 (Iowa 2007) ("The doctrine of incorporation requires the contract to make a clear and specific reference to an extrinsic document to incorporate the document into the contract.").

Second, the contracts were entered into by different parties. The Redemption Agreement was entered into in 2002 between Lucy and Platinum. Lucy and Briggs entered into the SPA in 2013. Platinum is a corporate entity separate and distinct from Briggs. In the context of non-compete agreements, the Iowa Supreme Court has paid particular attention to the actual parties to the agreement. For example, in *Casey's General Stores, Inc. v. Campbell Oil Co.*, the supreme court found that controlling shareholders of a corporation were not bound by a non-compete agreement where the plain language of the non-compete agreement applied only to the corporation they owned and not them personally. *See* 441 N.W.2d 758, 762 (Iowa 1989) ("As Campbell Oil points out in its argument, the relationship between itself, as a corporation, and Les and Norma Campbell imposes no servitude on the Campbells as individuals. As controlling shareholders, the Campbells control the actions of the corporation rather than the corporation controlling them."). The same principle is applicable here. In *Casey's*, the supreme court held the restriction on the corporation's activities would not be extended to the corporation's principals when the contract did not so provide. Similarly, in this case, the enforcement mechanism provided to the corporation to cease payment in the event Lucy violated the terms of the covenant not to compete should not be extended to Briggs when the contracts did not so provide.

Other courts have drawn similar distinctions in the enforcement of non-competition agreements, drawing sharp distinctions between entities and their principals based on the language of the contract at issue. *See, e.g.*, *Lee & Lee Intern., Inc. v. Lee*, 261 F.Supp.2d 665, 674 (N.D. Tex. 2003) ("Nowhere in the noncompete clause does it say that [d]efendant agrees that she will not set up a

business selling Lee & Lee products. The [c]ontract in no way prohibits its shareholders from selling Lee & Lee products in their individual capacity. While [p]laintiffs may have intended for [d]efendant to be prohibited from setting up a business selling identical Lee & Lee products, that was not the agreement set forth in the [c]ontract."); *Otto v. Weber*, 379 N.W.2d 692, 696 (Minn. Ct. App. 1986) ("The non-compete clause in a contract for the sale of business assets between corporations does not personally bind appellant, who signed the contract as president of his corporation."); *Bernstein v. Warner*, 185 A.2d 452, 455 (R.I. 1962) ("In support of all of his contentions the complainant argues that, although the noncompetitive agreement may technically bind the corporation, [it] . . . was intended to bind the respondents individually. The agreement was drafted by the complainant and he was apparently content to have it signed by the respondents in their corporate capacities.").

Third, and related, the plain language of the agreements does not condition Briggs' payment obligations on Lucy's compliance with the covenant not to compete. Section 9.8 of the Redemption Agreement applies only where the payments for Lucy's shares were made by Platinum "pursuant to section 5.3(b)" of the Redemption Agreement. In this case, the payments are being made by Briggs pursuant to section 2 of the SPA. While the SPA's terms are consistent with the terms set out in the Redemption Agreement, they are not one in the same. There is no language in the SPA incorporating the restrictive covenant into the agreement. Because Briggs' installment payments for Lucy's stock are not made "pursuant to section 5.3(b)" of the Redemption Agreement, the contingency regarding compliance with the terms of the covenant not to compete is inapplicable

here. *See Farm Sec. Admin. v. Harren*, 165 F.2d 554, 562 (8th Cir. 1948) (noting provisions of a contract between parties are controlling upon them).

Next, we review the duration of the covenant not to compete. Section 9.2(a) prohibited Lucy's participation in the relevant market "through the period ending two years after the later to occur of (x) Lucy ceasing to be employed by Corporation; or (y) after Lucy is paid in full for his shares as provided in [a]rticle 5." As discussed in the preceding paragraphs, Briggs' payment to Lucy are made pursuant to section 2 of the SPA and not article 5 of the Redemption Agreement. Thus, provision (y) of section 9.2(a) is not implicated here. The duration of the covenant not to compete is thus governed by provision (x). Like the district court, we conclude the period of non-competition is limited to two years from Lucy's termination of employment, December 31, 2014. However, unlike the district court, we reach this conclusion under the plain language of the agreement and not in consideration of the reasonableness or restrictive nature of the covenant.

In sum, the terms and conditions of payment for Lucy's shares are governed by the SPA and not the Redemption Agreement. Nothing in the SPA permits Briggs to terminate payment for Lucy's shares upon a violation of the restrictive covenant contained in the separate Redemption Agreement. Because the payments for Lucy's shares are made by Briggs pursuant to the SPA and not by Platinum pursuant to the Redemption Agreement, the covenant not to compete expires two years following the cessation of Lucy's employment with Platinum. We affirm the judgment of the district court on different grounds on appeal and reverse the judgment of the district court on cross-appeal.

**AFFIRMED ON APPEAL; REVERSED ON CROSS-APPEAL.**