## MOFFETT v. FISKE.

### No. 5061.

Court of Appeals of District of Columbia.
Argued March 9, 1931.
Decided June 29, 1931.

H. C. Workman, and C. B. Rugg, both of Washington, D. C., for appellant.

Ernest Wilkinson and R. J. Mawhinney, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, HITZ, and GRONER, Associate Justices.

HITZ, Associate Justice.

This is an appeal by William A. Moffett, one of the defendants in an action for damages in the Supreme Court of the District of Columbia, from a judgment of $198,500, with interest and costs, for alleged infringement of a patent.

Bradley A. Fiske, appellee here, plaintiff there, was in 1874 graduated from the United States Naval Academy and commissioned an officer of the line.

After various assignments of duty ashore and afloat he served for two years, commencing in the spring of 1900, as inspector of ordnance at the Bliss Plant, in Brooklyn, where, as he admits and the court finds, "he acquired all the knowledge of torpedoes extant in this country, and he retained that knowledge and experience until the time he applied for his said patent."

During the winter of 1910–1911, as captain, he was a member of the General Board of the Navy, and head of the Committee on War Plans. Most of his time in that post being spent in devising plans for recapturing the Philippine Islands, if captured by an enemy, it occurred to him that such capture might be avoided by airplanes equipped to carry and discharge torpedoes.

After much thought on this subject, and discussion with his associates of the board, he, then a rear admiral, went to duty as commander of a division of the Atlantic Fleet.

While so detailed, he applied for a patent for a "Method of and apparatus for delivering submarine torpedoes from airships." This application, with drawings and specifications, being filed in April, 1912, a patent issued thereon July 16, 1912.

This patent covered a device for dropping automobile torpedoes from airships by gravity, with the principle and method of its operation.

For present purposes, the method and apparatus may be described as follows:

An airplane with a torpedo suspended therefrom was to fly at a comparatively high elevation to about 1,500 yards of its target, swoop down as rapidly and as vertically as possible to within 10 or 15 feet of the water, and, with the bow of the torpedo bearing on the target, start the mechanism, and release the torpedo, to fall by gravity to the water, after which it was to perform its work by its own power and in the usual way.

For this purpose the airplane was to be equipped with chocks on its bottom or lower frame, in which the torpedo was to be held rigid by a strap under its middle connected at one end with the ship and at the other by a ring with a pivoted latch disengaged by a hand lever to release the torpedo.

The usual protruding lever for starting the propelling mechanism of the torpedo was to be first pressed forward by the toe of a lever connected by a link with the same hand lever.

Shortly after obtaining his patent, the plaintiff became aide for operations, and though it appears he tried, from time to time, to interest naval authorities in the subject of his patent, he met with little success.

Later, however, the Navy Department undertook experiments with torpedoes, together with airplanes, and, without plaintiff's

assistance, expended much time, energy, and money in obtaining planes which could successfully carry and discharge torpedoes as well as torpedoes which could successfuly be carried and discharged.

Those experiments met with some approval, and a number of torpedo planes were placed in service.

Plaintiff claiming infringement of his patent, sought compensation from the government, and, being denied, filed suit under Rev. St. § 4919 (35 USCA § 67) for damages for infringement against the then Secretary of the Navy, two officers alleged to have been concerned in torpedo plane experiments, and Rear Admiral Moffett, who for the greater part of the time of said experiments was chief of the Bureau of Aeronautics.

The suit was brought against them personally, and as to all but defendant Moffett a voluntary nonsuit was taken before judgment.

It was by agreement tried to the court without a jury, and a judgment of $198,500, with interest and costs, rendered against Admiral Moffett.

At the conclusion of the evidence, consistently with the manner of trial, the defendant, instead of the usual motion for a directed verdict, moved for judgment because of a shop right in the government, or actual ownership of the patent by the government, because the evidence showed no infringement of the patent, and for other reasons.

This motion was taken under advisement with the case, and denied when the cause was decided for the plaintiff.

In arriving at its judgment, the court found the right of an officer in the army or navy to take out a patent of the class in suit, citing as one of the two cases United States v. Burns, 12 Wall. 246, 20 L. Ed. 388, and further upheld the right of such a patentee to sue an officer of the government personally for infringement in making use of his patent in government work, citing with another case U. S. v. Lee, 106 U. S. 196, 1 S. Ct. 240, 27 L. Ed. 171, and Crozier v. Fried Krupp Aktiengesellschaft, 224 U. S. 290, 32 S. Ct. 488, 56 L. Ed. 771.

We will first consider the refusal of the trial court to find the ownership of the patent or a shop right therein by the government, and its finding to the contrary, being assignments of error numbered 33, 34, and 35.

In Solomons v. United States, 137 U. S. 342, 11 S. Ct. 88, 34 L. Ed. 667, the chief of the Bureau of Engraving and Printing invented a self-canceling stamp which he thereafter patented, and assigned the patent to Solomons, who sued the government in the Court of Claims because of its use, and appealed from an adverse decision.

The Supreme Court, at page 346 of 137 U. S., 11 S. Ct. 88, 89, in affirming the Court of Claims, said: "An employee, performing all the duties assigned to him in his department of service, may exercise his inventive faculties in any direction he chooses, with the assurance that whatever invention he may thus conceive and perfect is his individual property. There is no difference between the government and any other employer in this respect. But this general rule is subject to these limitations: If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer. Whatever rights as an individual he may have had in and to his inventive powers, and that which they are able to accomplish, he has sold in advance to his employer. So, also, when one is in the employ of another in a certain line of work, and devises an improved method or instrument for doing that work, and uses the property of his employer and services of other employees to develop and put in practicable form his invention, and explicitly assents to the use by his employer of such invention, a jury, or a court, trying the facts, is warranted in finding that he has so far recognized the obligations of service flowing from his employment and the benefits resulting from his use of the property, and the assistance of the co-employees, of his employer, as to have given to such employer an irrevocable license to use such invention."

In the later case of Gill v. United States, 160 U. S. 426, 16 S. Ct. 322, 40 L. Ed. 480, Gill, a machinist in a government arsenal, patented certain inventions he made while there, and sought to recover for their use by the government.

The Supreme Court, in affirming the decision of the Court of Claims against Gill, said at page 434 of 160 U. S., 16 S. Ct. 322, 325: "Now, whether the property of the government and the services of its employees be used in the experiments necessary to de-

velop the invention, or in the preparation of patterns and working drawings, and the construction of the completed machines, is of no importance. We do not care, in this connection, to dwell upon the niceties of the several definitions of the word 'develop' as applied to an invention. The material fact is that in both this and the Solomons Case the patentee made use of the labor and property of the government in putting his invention into the form of an operative machine; and whether such employment was in the preliminary stage of elaborating and experimenting upon the original idea, putting that idea into definite shape by patterns or working drawings, or finally embodying it in a completed machine, is of no consequence. In neither case did the patentee risk anything but the loss of his personal exertions in conceiving the invention. In both cases there was a question whether machines made after his idea would be successful or not, and, if such machines had proven to be impracticable, the loss would have fallen upon the government."

In Houghton v. United States (C. C. A.) 23 F.(2d) 386, the same rule was applied in the case of a government chemist claiming on a patent for a fumigant invented while in the service.

Did the trial court correctly apply this law to the facts of this case?

■ The plaintiff, after receiving education at the Naval Academy fitting him for a career of naval service, was graduated and commissioned in 1874.

The record here shows little of his activities until 1900, when he went for two years as inspector of ordnance at the Bliss Plant in Brooklyn, where he testifies that he inspected all torpedoes manufactured, with their assembly, with shop tests and running tests at Sag Harbor, thus acquiring as an officer in the naval service all knowledge of automobile torpedoes then known, which knowledge and experience he retained until he applied for the patent in suit.

This was his duty, and in its discharge he acquired his knowledge, and the experience thus acquired belonged to the nation, from which he received the compensation provided for officers of his rank.

He displayed inventive ingenuity during his career, which added to his qualifications as an officer, and, having reached the rank of captain by 1910, was then ordered to the important billet of member of the General Board of the Navy and head of the Commit-

tee on War Plans, all of which means that his employment was not manual but intellectual, and that all the powers of his mind, including his inventive ingenuity, if exercised upon means and instruments of naval warfare, belonged to the nation as his employer.

He testified that he spent most of his time at that period in devising plans for recapturing the Philippine Islands in case of their capture by an ememy, and that it occurred to him that such capture might be prevented by airplanes equipped to drop bombs or discharge torpedoes.

That was a war plan, and he claims its origin, but it was none the less in line of his employment and the result of the training and education which he owed to the government.

The application of his idea was difficult, and he gave it much thought, testifying in effect that it took him two years to solve the difficulties to his satisfaction.

The record is not clear as to just when he completed his invention as patented.

According to his testimony, as read to the court from a prepared statement, it was sometime in March, or before April 12, 1912, when the application for patent was filed, and while a rear admiral in command of a division of the Atlantic Fleet.

But in his letter of February 5, 1926, to the Judge Advocate General of the Navy, he wrote: "In fact, I invented the torpedo plane before I was a Rear Admiral, though I did not patent it for sometime afterwards."

He had already testified he was a captain on the General Board when head of the Committee on War Plans.

And in his article "The Future of the Torpedo Plane" he wrote: "I did not apply for a patent on this scheme for a year or more. * * *"

That would place the time of invention as prior to April 12, 1911, and the record shows he was head of the Committee on War Plans 1910–1911.

It was his duty as head of that committee to devise plans to protect the Philippines, and he said most of his time there was so spent, and much thought during that time given to the utilization of torpedo planes in that connection.

Now, if he spent that time and thought, while in the service of the government, in endeavoring to find a method and apparatus for adapting torpedoes to airplanes, and finally conceived a way of doing so, it follows

that the invention became his employer's, that is to say, the government's.

We cannot agree with the trial court that, when a member of the General Board of the Navy and head of the Committee on War Plans spends his time and ingenuity in devising a method and apparatus for discharging torpedoes from airplanes as a part of a scheme of naval defense, he is entitled to withhold the device from the government.

Nor does the fact, if it be a fact, that some details were not perfected to his satisfaction until shortly after he was transferred to command of a fleet, alter the situation.

Furthermore, the great expense and labor involved in experiments by others to ultimately adapt torpedoes for discharge from airplanes were borne by the government and its agents other than the plaintiff, whose invention when, and as, patented was plainly inoperative for the purpose intended.

Much of this work and experimentation was done at, and all after, the earnest and frequent solicitation of the plaintiff, who made no claim for compensation until the efforts of others were well on the way to whatever success has been attained by the patented device.

"A patentee is bound to deal fairly with the government, and, if he has a claim against it, to make such claim known openly and frankly, and not endeavor silently to raise up a demand in his favor by entrapping its officers to make use of his inventions." Gill v. United States, 160 U. S. at page 437, 16 S. Ct. 322, 327, 40 L. Ed. 480.

If ownership and license of the patents of government employees are to be decided by the general rules of master and servant governing patent rights, as the Supreme Court holds in the Solomons Case, the rule applies to naval officers with even greater reason than to civil employees such as the machinist in the Gill Case on his per diem pay. For naval officers are educated at the expense of the government; paid during their academic career; have life tenure of office thereafter; subsistence allowances in addition to salary; retirement pay in old age; and pensions to dependents after death.

In our opinion, application of the law, as laid down by the cases decided to the facts recited, establish an irrevocable license in the government to the use of plaintiff's invention and patent, even if that patent were not, as we think it is, invalid for inoperativeness.

■ Several assignments of error make this claim.

In Fowler v. Dodge, 14 App. D. C. at page 482, this court, on a question of operativeness, said: "it is not usual for the courts to disturb the conclusions of the Patent Office upon any such question as that without very cogent proof of error."

But this record presents cogent proof of error.

For Admiral Fiske testified that when he applied for this patent he had never seen a seaplane, and but two airplanes in exhibition flight, which were flimsy affairs and purely experimental.

The verdict formally finds as facts that at the date of the patent no airplane was in existence capable of carrying the torpedo required, that no torpedo was known able to sustain the shock of dropping from an airplane at the minimum speed of flight, that improved torpedoes were required for such use, that years of work and experimentation subsequent to the patent were required to produce such torpedoes and to make the conception of launching torpedoes from airplanes practical, while all labor, material, and money required for such experimentation had been furnished by the United States.

Yet, at a time when airplanes were hardly capable of rising from the ground, Admiral Fiske presumes a plane capable of carrying and discharging a torpedo weighing a ton.

This plane was to swoop down from a "comparatively high elevation," as rapidly and as vertically as possible to within 10 or 15 feet of the water; then to start the internal mechanism of the torpedo by the forward movement of a lever such as the inventor says he had never seen; and then drop the torpedo into the water in a condition to strike its target 1500 yards away.

To the development of such a plane, the plaintiff has contributed nothing, yet by this judgment he is given damages against a brother officer based upon the total cost of 397 such planes alleged to have been used with torpedo dropping devices infringing his patent.

The plaintiff testified that he was aware of these difficulties, but "felt sure that airplanes would rapidly grow bigger and stronger."

While in the meantime his patent was a pioneer patent entitled to be liberally construed.

But this invention "does not belong to that class of simple inventions which require no other proof of their practicability than

the construction of a model." O'Connell v. Schmidt, 27 App. D. C. 81.

For the plaintiff's invention not only required a plane then unknown to the world, and a torpedo equally unknown, but subsequent experiments demonstrated the uncertainty or failure of several details of his device and his method of operation.

The plaintiff provides for the security of his torpedo in its chocks by a bellyband which was later found to be impracticable, because, among other reasons, the launching by release as contemplated could not be successfully accomplished. He provides for starting the internal mechanisms of the torpedo by a forward movement of a lever, while the testimony showed, and the verdict found, that up to the time of trial below, in July 1929, seventeen years after his patent, no torpedo was known with a starting lever actuated in the forward direction.

He provides for starting the mechanisms of the torpedo before its release from the plane, but later experiments of others demonstrated the compelling wisdom, if not the necessity, of doing this after its release, by use of a lanyard instead of a lever.

In fact, the plaintiff testified that his invention "was a pure dream embodied in the descriptions and drawings," and that he was amazed at the facility with which a patent was obtained for a thing so obvious.

We think his amazement was justified; but a dream, like an idea, is not an invention, and cannot be patented until embodied in a physical contrivance making it practically useful.

And the useful contrivance cannot be patented, even if new, unless its novelty amounts to discovery.

Until the inventor has done this as a matter of reasonable legal certainty, and not as a matter of mere conjecture or prophetical possibility, he has given nothing to the public in return for the monopoly which he seeks by letters patent. Le Roy v. Tatham, 14 How. 156, 14 L. Ed. 367; Thompson v. Boisselier, 114 U. S. 11, 5 S. Ct. 1042, 29 L. Ed. 76; Clark Thread Co. v. Willimantic Co., 140 U. S. 489, 11 S. Ct. 846, 35 L. Ed. 521; Coffin v. Ogden, 18 Wall. (85 U. S.) 120, 21 L. Ed. 821; De Forest Radio Co. v. Gen. Electric Co., 51 S. Ct. 563, 75 L. Ed. 1339, decided May 25, 1931; Columbia Motor Car Co. v. Duerr & Co. (C. C. A.) 184 F. 893, 908; In re Mattullath, 46 App. D. C. 143; Wickers v. McKee, 29 App. D. C. 13; Gilman v. Hinson, 26 App. D. C. 415.

As we are of opinion that the patent issued was invalid, for inoperativeness, and, in any event, that the United States was entitled to an irrevocable, but nonexclusive, license therein, the judgment is reversed, without costs, and the cause remanded for further proceedings.