**H. C. BAXTER & BRO., a partnership,**
and
**General Foods Corporation, a corporation of Delaware, Plaintiffs,**

v.

**The GREAT ATLANTIC & PACIFIC TEA COMPANY, Inc., a corporation of Maryland, Defendant.**

Civ. No. 7–136.

United States District Court
D. Maine, S. D.
Dec. 10, 1964.

**602**

Paul A. Wescott, Daniel T. Drummond, Jr., Portland, Me., and W. Brown Morton, New York City, for plaintiffs.

William B. Mahoney, Portland, Me., Nicholas J. Stathis and John T. Kelton, New York City, for defendant.

GIGNOUX, District Judge.

This is an action for infringement of United States Letters Patent No. 2,498,-024, entitled "Prefrying Treatment of Potatoes," issued on February 21, 1950, to John L. Baxter of Brunswick, Maine, upon application Serial No. 689,205 filed on August 8, 1946. The action was insti-tuted on December 26, 1962, by the then owner of the patent, H. C. Baxter & Bro. Subsequently, on January 7, 1963, H. C. Baxter & Bro. assigned to General Foods Corporation an undivided 13% interest in the patent, and on February 14, 1964, General Foods was joined as a party plaintiff. Plaintiffs rely only upon claims 1, 6 and 7 of the patent. In its answer, defendant asserts the customary defenses of invalidity and non-infringement. Defendant also counterclaims for a declaratory judgment that the patent is invalid and not infringed by it, and for a reasonable attorneys' fee and its costs. Plaintiffs seek an accounting, and both parties request appropriate injunctive relief.

As described in the patent specifications, the claimed invention "relates to the treatment of raw or cooked potato particles and particularly to such particles in the form of strips for French frying, in order to secure a desired and substantially uniform change in their color when they have been suitably cooked by frying." (Pat. Col. 1, lines 1–6). The specifications recite that in the frying of potatoes on a commercial basis, it is important that they be suitably browned when fried; and whether suitable browning can be attained depends on their sugar content. (Pat. Col. 1, lines 7–11). Where the sugar content of the potatoes is low, as is the case when the potatoes are freshly dug, the potato particles do not change color sufficiently when cooked by frying. On the other hand, if the sugar content of the potatoes is high, the particles when suitably fried are too dark because of the caramelization of the sugar.[1] (Pat. Col. 1, lines 12–26). While the sugar content of potatoes may be governed to some extent through a control of storage temperatures,[2] the expense of con-

---

1. As the record shows, caramelization is the degradation or breakdown of the sugar molecules by heat—what a layman would describe as burning.

2. Under normal storage conditions potatoes will acquire a relatively high sugar content. If the storage temperatures are relatively high, however, the sugar content of the potatoes will be low. Generally, the lower the storage temperature, the higher the sugar content; the higher the storage temperature, the lower the sugar content. (Pat. Col. 3, lines 28–35).

trolling storage conditions is substantial. (Pat. Col. 1, lines 29–37). The alleged invention purports to minimize the problem "by treating raw or cooked potato particles to establish, at least in the surface layer of the particles, a sugar content such that when the particles are suitably cooked by frying, the desired color change will result with substantial uniformity." (Pat. Col. 1, lines 40–46). This result is stated to be accomplished by immersing the particles in a solution of a sugar that may be absorbed by the particles and then cooking them by frying in a suitable medium, the characteristics of the solution, the time of immersion, and the frying time and temperature being so related to each other and to the natural sugar content of the particles that the desired color change is attained upon frying. (Pat. Col. 1, line 46–Col. 2, line 6). In the patentee's own words,

"Where the natural sugar content is low, the treatment adds sugar to supplement any natural sugar that may be present in the particles. Where the natural sugar content is high but capable of being corrected by leaching, I dip the particles in a hot sugar solution so that at the completion of the leaching step a final sugar content is established that ensures that the desired color is secured when the particles are fried. Where the natural sugar content of some of the potatoes is high and too low in others, the hot sugar solution has a combination effect establishing and maintaining substantial unformity of sugar content by a limited leaching action on the particles having excessive natural sugar and supplementing any natural sugar in particles having a sugar deficiency." (Pat. Col. 2, lines 7–23).

The patent specifications recite that while the sugar content of the potato particles may be determined by any suitable means, this may be done with sufficient accuracy for the purposes of the invention by frying samples under the conditions to be used in frying the particular batch of potatoes and comparing the color of the thus fried samples with a color chart showing the sugar content by color pre-established by frying various samples under uniform conditions of time and temperature. (Pat. Col. 2, lines 24–41).

The specifications further state that the primary requirement of the sugar is that it be readily absorbed by the potato particles. (Pat. Col. 3, lines 51–52). Suitable sugars are specified to be, in the class of monosaccharides, dextrose, fructose and galactose; in the class of disaccharides, sucrose, lactose and maltose; and raffinose, a trisaccharide. (Pat. Col. 3, lines 53–56). The patent states that while any of these sugars may be used, dextrose "is perhaps best suited for the practice of * * * [the] invention under commercial conditions." (Pat. Col. 3, lines 57–60). The sugar solution may vary within substantial ranges "as between .25% to 10% by weight of the sugar to the water"; the preferred range is from .25% to 3%. (Pat. Col. 3, lines 61–64). The immersion time may also vary from ¼ to 5 minutes, but an immersion time of 1 to 3 minutes is preferred. (Pat. Col. 3, lines 71–74). While the temperature of the solution may range from just above its freezing point to its boiling point, the preferred range is between 60° F. and its boiling point. (Pat. Col. 3, line 74–Col. 4, line 3). The specifications state that the higher temperatures are not necessary except where a leaching action is required. (Pat. Col. 4, lines 6–8). The patentee recommends a frying time of 4½ minutes and a frying temperature of 360° F., although stating that satisfactory results are obtainable within the range of 300° to 425° F. (Pat. Col. 3, lines 8–15). Finally, the specifications recite that in practice the patentee uses a 1% dextrose solution at its boiling point and varies the dipping time in relation to the natural sugar content of the potato particles, utilizing a 1 minute dip where the natural sugar

content of the particles is uniformly low; increasing the immersion time to 3 minutes if their natural sugar content is low to medium; and using a 2 minute dip if the raw potatoes are of mixed low and high natural sugar content. (Pat. Col. 4, lines 22–37).

The patent claims in suit read:

"1. The method of treating potato particles, the natural sugar content of which is such that the desired color change cannot be attained when the particles are cooked by frying, which method comprises preparing a solution of a sugar that may be absorbed by the particles and in which the percentage by weight of the sugar to the liquid is within the range of .25% to 3%, immersing the particles in the solution for a period of from 1 to 3 minutes to affect the sugar content in at least the surface layers of the particles, and frying the thus treated particles in a frying medium at a temperature within the range of 300° to 425° F.

"6. The method of treating potato particles, the natural sugar content of which is too low to enable the desired color change to be attained when the particles are cooked by frying, which method comprises preparing a solution of a sugar that may be absorbed by the particles and in which the percentage by weight of the sugar to the liquid is from .25% to 3%, and immersing the particles in that solution for a time inverse to its concentration and within the range of from 1 to 3 minutes, thereby to secure a desired substantially uniform color change when the particles are cooked by frying.

"7. The method of claim 6 in which the sugar is a monosaccharide such as dextrose, fructose, and galactose."

A brief statement of the development and commercial history of the Baxter process will be helpful to an understanding of the patent questions which are presented in this litigation. The evidence discloses that H. C. Baxter & Bro. is a business partnership, which, with its predecessor partnerships, has been engaged in producing and marketing food products for many years. Baxter's original products were canned vegetables, but during World War II one of its major products was dehydrated potatoes for the United States Army. In 1944, with the end of World War II approaching, the partnership established a products development committee to find other products which might utilize its potato handling facilities. After limited experimentation with canned French fried potatoes, the Baxter management decided to develop a process for the commercial production of frozen French fried potatoes; and by the fall of 1945 the firm was devoting most of its research to this endeavor. Baxter's quality control manager, Francis R. Saunders, was in charge of the project under Mr. Baxter's general supervision.

One of the first problems encountered by the partnership in developing a process for the commercial production of frozen French fried potatoes was that of obtaining a satisfactory brown color in the finished product. Saunders found that the freshly dug potatoes he was using in his experiments turned out almost white in color when fried. Mr. Baxter recalled that during the early 1930's the partnership had attempted to reduce the cost of producing its canned cream-styled corn by substituting dextrose for sucrose as a sweetening agent, but that it had been forced to abandon the practice because the dextrose had had the undesired effect of darkening the color of the creamed corn. At a staff meeting in November 1945 he suggested that a satisfactory color for the frozen French fried potatoes might be achieved by treating the raw potato strips with a dextrose solution. Subsequently, during the fall and winter of 1945–46 Saunders conducted a series of experiments with the use of various sugar dips to obtain a satisfactory brown color after

frying. He found that a sucrose dip did not produce the desired result, but that a dextrose dip did. In December 1945 Mr. Baxter first determined to apply for a patent upon the process thus developed, and in February 1946 he requested his patent counsel to prepare a patent application.

Baxter's first commercial production of frozen French fried potatoes was a sales test run for General Foods in March 1946. At that time Baxter was selling its entire production of frozen fresh vegetables to what is now the Birds Eye Division of General Foods. Following the success of the test run, in the spring of 1946 Baxter commenced construction of a plant at Corinna, Maine, and in January 1947 it began full-scale production of frozen French fried potatoes for distribution by General Foods as a part of its Birds Eye line.[3] At about this time Baxter and General Foods entered into a written contract by which Baxter agreed to produce frozen French fried potatoes exclusively for General Foods for a period of five years. It was also orally agreed that General Foods might have free use of the Baxter patent during the term of the contract, and that the parties would collaborate in further development of the Baxter process.

The initial Baxter process for the production of frozen French fried potatoes may be briefly described as follows. Representative samples of incoming lots of raw potatoes, whether from the field or from storage, were graded as to sugar content by a "fry test." For the purposes of the "fry test," French fry strips were cut from 20 potatoes selected at random from each lot, and these were fried for 4½ minutes at a temperature of 350° F. The fried strips were then classified as to color in seven groups, namely, "very low," "low," "medium low," "medium," "medium high," "high," and "very high." If a given lot met acceptable standards,[4] the raw potatoes were successively washed, steam-peeled, inspected and trimmed for defects, mechanically sliced and cut into strips, again washed, and then blanched from 1 to 3 minutes in a hot water blancher containing a .75% dextrose solution at a temperature of 185° F.[5] After emerging from the blancher, the potato strips were conveyed on a wire mesh drainage belt to two stage fryers. In the first fryer they were fried for 2 minutes and 55 seconds at 340° F. In the second fryer they were fried for 1 minute and 10 seconds at 370° F.[6] After leaving the fryers, the potato strips were drained of surplus fat, air cooled, packaged, labelled and frozen.

General Foods in 1949, prior to the expiration of its 5-year contract with Baxter, commenced construction of an extension to its existing frozen foods processing plant at Caribou, Maine. Shortly thereafter it began to use the Baxter process to produce frozen French fried potatoes for its own account. As General Foods expanded its production at Caribou, it became apparent that it would no longer require Baxter's full production; and the parties mutually agreed to terminate Baxter's exclusive obligation under the 5-year contract. As a result, in 1951 Baxter began selling frozen French fried potatoes to other customers.

3. Since January 1947 Baxter has produced its frozen French fried potatoes through Snowflake Canning Company, a corporation which is wholly owned by the partnership and the individual partners.

4. Saunders testified that the original Baxter process permitted use of potatoes in the "low," "medium low," "medium" and "medium high" · groups, provided there was no more than a three-group spread in any one lot.

5. Mr. Baxter described the blancher as "a long cylindrical machine; galvanized iron covers over it, and steam pipes going into it and a screw arrangement going through the bottom of it to carry the product through the water, the hot water, which, [sic] in this case the hot dextrose which is contained within the blancher."

6. Subsequently, Baxter converted to a single fryer in which the potato strips were fried for 1½ minutes at 370–375° F.

In 1952 both Baxter and General Foods modified the original Baxter manufacturing process by the addition of a hot water blanching step in advance of the hot dextrose dip, the purpose being to permit the processing of potatoes having a wider variation of sugar content. By the modified process the raw potatoes were still graded as to sugar content in seven groups by the "fry test"; but by the addition of the hot water blanch before the hot dextrose dip, the parties found that four of the seven groups could be used, instead of three, and the desired color of the final product still could be achieved.[7] Baxter and General Foods have used the modified process, essentially without change, continuously since 1952.

Following expiration of the Baxter-General Foods 5-year contract, General Foods' purchases of frozen French fried potatoes from Baxter gradually diminished and ceased altogether about 1960. In 1961 Baxter instituted in this Court an action against General Foods for infringement of its patent. This action was settled in January 1963, shortly after Baxter had commenced the present action against defendant, by the assignment to General Foods of a 13% interest in the patent.[8]

Baxter began selling frozen French fried potatoes to defendant about 1952. In 1961 defendant started construction of its own plant for the production of frozen French fried potatoes at Fort Fairfield, Maine, and its purchases from Baxter stopped when the Fort Fairfield plant began commercial production in October 1962. The process initially installed and presently used by defendant at its Fort Fairfield plant includes two plain hot water blanches prior to the dextrose dip.[9] The blanched potato strips then pass through an S-shaped flume containing a 2% dextrose solution at 160° F., in which they remain from 5 to 7 seconds. The evidence further discloses that defendant controls the sugar content of the raw potatoes by rigorously regulated storage under controlled temperatures, both in outside warehouses and in bin boxes in the plant, in order to level out their sugar content before they are processed.[10]

The two basic issues in this action are whether claims 1, 6 and 7 of the patent in suit are valid and whether they are infringed by defendant's process. Because, in the view of the Court, the evidence compels the conclusion that the claims in suit are invalid, the Court feels it appropriate to dispose of the case on the issue of validity, and finds it unnecessary to reach the questions raised as to infringement. Cf. Grant Paper Box Co. v. Russell Box Co., 151 F.2d 886, 890 (1st Cir. 1945), on rehearing judgment vacated on other grounds, 154 F.2d 729 (1st Cir.), cert. denied, 329 U.S. 741, 67 S.Ct. 79, 91 L.Ed. 639 (1946).

Defendant's main contention, which is dispositive of this action, is that the

---

7. It is not clear from the record whether Baxter or General Foods originated this idea. In any event, personnel from the two plants were working closely together during this period on improvements upon the original Baxter process; and as Mr. Baxter testified, "Perhaps it occurred to them first or perhaps to us, or perhaps it was a mutually conceived idea."

8. Under the terms of the settlement General Foods agreed to pay Baxter $20,000, of which $10,000 was to be paid on the date of the settlement and $10,000 was to be paid upon termination of the present action. General Foods also agreed to pay Baxter any royalties which might accrue to General Foods by reason

of its interest in the patent up to the amount of $200,000. Plaintiffs' witnesses deny that the institution of the present action was a condition of this settlement.

9. In the first hot water blancher the raw potato strips are subjected to water at 160° F. to 170° F. for 2½ to 3 minutes; in the second hot water blancher, they are subjected to water at 170° F. to 190° F. for a further 2½ to 3 minutes.

10. In May 1964, in anticipation of the trial of the present action, defendant successfully operated its Fort Fairfield plant for ten days on a commercial production basis without using dextrose (or any other sugar) in its process.

Baxter patent is invalid on the grounds of inoperativeness and indefiniteness.[11] According to defendant, the major premise of the patent "is that immersing the potatoes in a sugar solution has an automatic combination effect of reducing the natural sugar content where it is high by leaching out sugar and supplementing the natural sugar content where it is low by adding sugar." (Post-Trial Memorandum of Defendant, p. 3.) Defendant's position is that the process described in the Baxter patent is ineffective to accomplish this asserted result because it does not leach out sugar and because some of the specified sugars do not add sugar.

Plaintiffs appear to be in agreement with defendant that Baxter's claimed invention resided in his alleged discovery that equalization of the sugar content of the surface layers of raw potato particles of unequal natural sugar content, and hence uniform color of the fried particles, could be attained by a single sugar dip under the conditions set forth in his patent. Baxter's alleged contribution to the art of processing French fried potatoes is set forth on page 12 of Plaintiffs' Main Brief. There plaintiffs state, "The essential novel feature of the process is the simultaneous treatment of potato pieces of varying sugar content in such manner that upon simultaneous frying all the pieces will have substantially the same color." Indeed, plaintiffs concede that the patent itself permits no other conclusion. Thus, plaintiffs agree that the critical concept of the patent is stated in the following paragraph of the specifications:

"Where at least some of the particles have an excess of natural sugar, but not such an excess that cannot be corrected by leaching, the sugar containing solution is hot. *This has the effect of leaching the excess natural sugar from some particles and supplementing the natural sugar, if any, in other particles to establish a substantially uniform sugar content of the surface layers of the batch.* Where all of the particles are characterized by an excess of natural sugar, the use of my invention is important as, at the end of the leaching operation, the particles have the desired sugar content." (Pat. Col. 4, lines 9 through 21). (Emphasis supplied.)

The file history of plaintiffs' patent reveals that in prosecuting the application in the Patent Office, Baxter admitted that it was known that sugar could be leached from potatoes by water blanching,[12] but asserted novelty in adding sugar to achieve color. Documentary and deposition prior art relied upon by defendant, however, eliminates any basis for such a contention. The documentary prior art shows that it was known prior to Baxter that the sugar content, and, more particularly, the reducing sugar content,[13] determined the amount of browning obtained by French frying of potatoes under given conditions of time and temperature. It also reveals an appreciation that the sugar content of potatoes can be controlled by storing

---

11. Defendant also argues that the patent is invalid on various other grounds, including prior knowledge and public use, 35 U.S.C. § 102(a) and (b), and lack of invention, 35 U.S.C. § 103. Because of the Court's conclusion that the patent is invalid for inoperativeness and indefiniteness, the Court has no occasion to consider these alternative contentions.

12. This acquiescence was apparently because of the disclosure of the Brunstetter patent (U.S. No. 2,056,884, issued October 6, 1936) and the Swartz patent (U.S. No. 2,212,461, issued August 20,

1940), both of which were cited by the Patent Office examiner in rejecting Baxter's initial claims.

13. As defendant's expert, Professor Ora Smith, testified, the sugars present in potatoes are of two types, reducing sugars and non-reducing sugars; the latter are ineffective for the purpose of obtaining the desired browning reaction except that if sufficiently high frying temperatures are employed, some browning may be obtained as the result of caramelization.

them at regulated temperatures. (See Sweetman, Journal of Agricultural Research, Volume 41, pp. 479–489, September 15, 1930; Peacock and Brunstetter, United States Department of Agriculture Circular No. 158, March 1931; Sweetman, American Potato Journal, Volume X, pp. 169–173, September 1933; Wright et al., United States Department of Agriculture Technical Bulletin No. 507, February 1936; Rogers et al., American Potato Journal, Volume XIV, pp. 269–290, September 1937; Thornton, Abstracts of Papers 99th Meeting American Chemical Society, Cincinnati, Ohio, pp. 18–19, April 8–12, 1940; Denny and Thornton, Contributions Boyce Thompson Institute, Volume 11, pp. 291–303, 1940, Volume 12, pp. 217–252, 1941, and Volume 12, pp. 405–429, 1942). Depositions in evidence further show that it was common knowledge long prior to 1945, the earliest date claimed by Baxter, among chefs and produce men supplying potatoes for French frying that when the natural sugar content of the potatoes was such that they would not brown sufficiently on frying, the desired browning could be attained by soaking the potato strips in a solution of sugar or dextrose for a period of several hours or overnight. (See depositions of Longo,[14] Poncelet, Weiss, Lee, Brownhoffer, Jackson, Jones, Ziegler, Micas, Sullivan, Posti, Gabrinetti and Kreis.) In sum, documentary and deposition prior art, none of which was cited to or apparently considered by the Patent Office examiner, discloses that the addition of sugar to potatoes to secure the desired color upon frying was well known long before Baxter.

The evidence thus plainly shows that, as defendant asserts and plaintiffs concede, the sole feature of novelty in Baxter's claimed invention was the use of a single sugar dip to obtain color uniformity in potatoes of varying sugar content. The serious question raised by defendant is whether the process as described by Baxter in his patent is effective to accomplish this result. Upon the record before it, the Court must conclude that it is not, both because the process described in the patent does not effect leaching at all, or at least over substantially the entire range of concentrations and immersion times specified in the claims, and because the patent includes sugars which are inoperative to attain the claimed result under the conditions of use which the claims set forth.

Evidence offered by defendant shows that with a sugar solution no leaching or reduction of sugar content occurs under the conditions described in the patent. Defendant's expert witness, Dr. Ora Smith, Professor of Vegetable Crops and of Food Science and Technology at Cornell University, testified that some leaching might occur in a cool solution of sugar, but at a rate which would be too slow to be of any practical value. In any event, the patent teaches that in order to leach, the solution must be hot (Pat. Col. 4, lines 9–12). Professor Smith testified without equivocation, however, that no leaching or reduction of sugar content takes place in a hot sugar solution, that is, in a solution having a temperature of about 140° F. or higher, within the range of concentrations and durations of immersions specified in the claims. In this regard, the following excerpt from a colloquy between Professor Smith and the Court succinctly summarizes his conclusions:

"The Court: Let me ask the question again with the limitations that I believe you have indicated. Am I correct in my understanding, Pro-

14. Longo, a produce man in Providence, Rhode Island, testified that he obtained the idea of dipping raw potato strips in a dextrose solution to attain a satisfactory fry color from baker friends of his, who told him that they used dextrose to attain a brown color in their baked goods. Longo also testified that he dipped the potato strips in the solution for about a minute and at first used five pounds of powdered dextrose to forty gallons of water. Professor Smith calculated that the result was a 1.5% dextrose solution. Longo varied the solution to obtain the desired degree of browning.

fessor Smith, that in your opinion immersing untreated high sugar content potatoes in a dextrose solution having a temperature of 140 degrees fahrenheit or higher will not reduce the sugar content of the potatoes?

 \* \* \* \* \* \*

"The Witness: No, that will not reduce the sugar content.

"The Court: And that will be your opinion if the solution were within the range of one-quarter of one per cent to three per cent by weight of the sugar to the liquid?

"The Witness: Yes, sir.

"The Court: And this is for the reasons which you stated in the course of your testimony this morning?

"The Witness: Yes, sir.

"The Court: Thank you very much."

Professor Smith explained that no leaching or reduction of sugar content occurs under these conditions because at temperatures of 140° F. and higher the starch gelatinizes at the surface of the potato; and as the starch gelatinizes, it absorbs the sugar solution. While a small amount of the natural sugar in the potato may tend to move outward from the center and go into the solution, this amount is small in comparison with the sugar absorbed from the solution by the gelatinized starch. In short, the net effect with a hot sugar solution is that sugar is added to the potato surface and no leaching or reduction of sugar content occurs.

Professor Smith's conclusions are fully supported by experimental work which he conducted in conjunction with Carl O. Davis, a research associate at Cornell University. In these experiments potato strips cut from different varieties of potatoes, which had been stored at different temperatures, were blanched in solutions of dextrose and of the various other sugars specified in the patent. The temperature of the solution in each instance was 210° to 212° F., close to its boiling point. The concentration of the solution was varied over a range from .5% to 3%, and the strips were immersed in the solution for periods ranging from .5 to 4 minutes. The strips were then fried at 360° F. for periods from 3 to 5 minutes. The results of these experiments and color slides showing the fried strips were received in evidence as Defendant's Exhibits 12 (pp. 7–15, 28–34 and 36–38), and 11, 13 and 14. They showed no leaching or reduction of color.

In support of plaintiffs' contention that the Baxter process is effective to "level" the varying sugar content of raw potato strips, they point to Mr. Baxter's testimony to the effect that one purpose of the single blancher process "was to reduce and equalize the color of variable-colored—originally colored strips, equalizing and having a uniformity-producing effect," and the testimony of both Baxter and Saunders that the process was "very effective" to accomplish this purpose. However, Baxter's and Saunders' testimony as to their observations in this regard is in sharp conflict with that of Dr. Kenneth G. Dykstra, research engineer of the Birds Eye Division of General Foods, and George W. Raye, manager of General Foods' Caribou plant. Both testified that the single blancher process did not produce satisfactory results with potatoes which had "either a high or a variable sugar content." Dr. Dykstra further stated that for this reason General Foods could not utilize in the original Baxter process potatoes which had not been conditioned or stored in such a way that they had a low sugar level, and that it was necessary to store the potatoes at a temperature of "70 or something like that, to bring these sugars down to an acceptable level." [15] Raye's testimony was to the same effect.

---

15. Dr. Dykstra also testified that Baxter had found it necessary to condition the raw potatoes by controlled storage in order to bring down their sugar content before they could be processed.

Other than Plaintiffs' Exhibits 29 and 36, plaintiffs offered no evidence of experimental work to support the teaching of the patent that leaching or reduction of sugar content is obtained when a hot sugar solution is used. With respect to the work done by Saunders in 1945 and 1946 prior to the filing date of the Baxter application, there is no record of any experiments involving the use of a sugar dip to reduce the color of high sugar content potatoes upon frying. In fact it is evident that the experimentation being conducted by the Baxter group in 1945 and 1946 was directed toward solving the problem of attaining sufficient color from low sugar content potatoes without over-frying.[16]

In rebuttal, plaintiffs offered in evidence Plaintiffs' Exhibits 29 and 36. They report the results of experiments conducted by Saunders during the course of the trial for the purpose of establishing that some leaching could be produced using a hot sugar solution within the ranges stated in the patent. Plaintiffs' Exhibit 29, however, concerned an experiment with potato chips which were dipped for 3 minutes in a .25% dextrose solution at 190° F. The results were inconclusive. While some over-all lightening may have been effected, Saunders admitted on cross-examination that uniformity of color was not achieved, for the dextrose-treated chips after frying had substantially the same variation in color as the untreated control chips. Saunders further admitted that the experiment was essentially meaningless because of the greater leaching possibilities of potato chips.

Plaintiffs' Exhibit 36 concerned an experiment involving potato strips which were blanched in a solution having the minimum dextrose (.25%) at the maximum temperature (212° F.) for the maximum time (3 minutes). All conditions were at the extremes of the claim ranges. On cross-examination, Saunders testified that he had not conducted any tests to determine whether a dextrose solution of more than .25% would effect leaching. He further admitted that in his early experimental work he had found that a .5% dextrose solution at the boiling temperature "had practically no effect in reduction of color" of medium potatoes, and that it "would tend to add sugar" to medium low, low and very low potatoes; and that his experimental work at that time "showed that there would not be any lightening effect with a 1% solution at the boiling temperature," even though the patent recommends use of a 1% dextrose solution at its boiling point in practice. (Pat. Col. 4, lines 22–27).

Thus, by plaintiffs' own admissions no leaching is obtained using a dextrose solution at .5% and higher. At best plaintiffs' evidence shows that leaching occurs only with a .25% dextrose solution at the extreme limits of the patent claims, and even then plaintiffs have adduced no evidence that a solution having the minimum sugar content under these conditions is effective simultaneously to add sugar to low sugar content potatoes and to produce the equalizing effect which the patent claims.[17]

The core of plaintiffs' position is contained in the statement in the patent specifications, to which reference has

16. In communicating his invention to his patent attorney, Mr. Baxter said nothing about the removal of sugar by leaching. In fact, his letter of February 28, 1946, requesting his attorney to initiate the patent application contains the following significant statement: "We have found that by dipping the cut raw stock in a 2% dextrose solution long enough for it to become a part of the outside surface of the potato we get, after frying, a beautiful golden brown color from potatoes that would never normally brown up because of low sugar. *We also find that this doesn't have any effect upon potatoes that would be normally brown because of higher sugar content.*" (Emphasis supplied.)

17. Saunders testified that it was "questionable" that a .25% dextrose blanch would be effective to increase the sugar content of medium low potatoes so as to achieve uniformity in a batch of medium low, medium and medium high potatoes.

been made, that a hot sugar dip "has the effect of leaching the excess natural sugar from some particles and supplementing the natural sugar, if any, in other particles to establish a substantially uniform sugar content of the surface layers of the batch." (Pat. Col. 4, lines 12–17). This, plaintiffs assert, is an accurate statement of the observed result of the described hot sugar dip on batches of potato strips "where at least some of the particles have an excess of natural sugar, but not such an excess that cannot be corrected by leaching * * *" (Pat. Col. 4, lines 9–11). This is the so-called "equilibrium" theory advanced by Saunders, which he finally admitted did not prove out in practice.[18] Defendant's evidence, and plaintiffs' own admissions, establish that these statements in the patent in respect of leaching sugar from the potato are simply untrue. Thus, the patent teaches results which are unobtainable.

 Under such circumstances, the patent and all of its claims are invalid for inoperativeness. A patent may be granted only on a new and "useful" process, machine, manufacture, or composition of matter. 35 U.S.C. § 101.[19] The term "useful" as used in the patent law means that the invention must attain the result claimed by the inventor in his disclosure; in other words, it must work and accomplish the purposes set forth in the specifications. O'Reilly v. Morse, 56 U.S. (15 How.) 62, 119, 14 L.Ed. 601 (1853); Coupe v. Royer, 155 U.S. 565,

572–574, 579, 15 S.Ct. 199, 39 L.Ed. 263 (1895); H. Brinton Co. v. Mishcon, 93 F.2d 445, 448 (2d Cir. 1937); Moffett v. Fiske, 60 App.D.C. 281, 51 F.2d 868, 871–872 (1931); Besser v. Merrilat Culvert Core Co., 243 F. 611, 612 (8th Cir. 1917); Commonwealth Engineering Co. v. Ladd, 199 F.Supp. 51 (D.C.D.C.1961); Isenstead v. Watson, 157 F.Supp. 7, 9 (D.C. D.C.1957). In O'Reilly v. Morse, supra 56 U.S. at 119, the Supreme Court spoke directly to the point in issue:

"Whoever discovers that a certain useful result will be produced, in any art, machine, manufacture, or composition of matter, by the use of certain means, is entitled to a patent for it; provided he specifies the means he uses in a manner so full and exact, that any one skilled in the science to which it appertains, can, by using the means he specifies, without any addition to, or subtraction from them, produce precisely the result he describes. *And if this cannot be done by the means he describes, the patent is void.*"

(Emphasis supplied.)

 Even accepting plaintiffs' evidence that leaching may occur with a .25% dextrose solution at the maximum temperature and time of immersion specified in the patent claims, neither the patent specifications nor the claims disclose any such limitation; as a result, a person attempting to use the process could only ascertain the limitation by ex-

---

18. Saunders' "equilibrium" theory was that when raw potato strips are immersed in a dextrose solution, there is an exchange of fluids and solids between the strips and the solution, so that equilibrium is achieved between the sugar content of the surfaces of the potato strips and the solution. In other words, if the sugar content of the potato strips is greater than that of the solution, sugar is leached from the strips; but if the sugar content of the potato strips is less than that of the solution, sugar is added to the strips. On cross-examination, however, he admitted that while theoretically there should be some leaching and a reduction of color if a potato containing .75% re-

ducing sugar (a medium low potato) were dipped in a .35% dextrose solution, actually "there is some sugar deposited in the surface cells and the color would be increased slightly." It was at this point that he abandoned his "equilibrium" theory with the admission, "I don't believe it does prove out in practice."

19. "§ 101. Inventions patentable
"Whoever invents or discovers any new and *useful* process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." (Emphasis supplied.)

perimentation. The law is clear that the necessity for such experimentation invalidates the patent, because of the requirement of 35 U.S.C. § 112 that:

> "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

In General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 369, 58 S.Ct. 899, 901, 82 L.Ed. 1402 (1938), the Supreme Court stated of this requirement:

> "Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirements as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.'" (Footnotes omitted.)

The Supreme Court has many times held that the requirement of accurate definition contained in Section 112, and its predecessor, is not met when the patented process can be carried out only after independent experimentation. Standard Brands, Inc. v. National Grain Yeast Corp., 308 U.S. 34, 38, 60 S.Ct. 27, 84 L.Ed. 17 (1939); The Incandescent Lamp Patent, 159 U.S. 465, 474, 16 S.Ct. 75, 40 L.Ed. 221 (1895); Tyler v. Boston, 74 U.S. (7 Wall.) 327, 330, 19 L.Ed. 93 (1868); Wood v. Underhill, 46 U.S. (5 How.) 1, 5, 12 L.Ed. 23 (1847). And see Standard Oil Co. v. Tide Water Associated Oil Co., 154 F.2d 579, 582–583 (3d Cir. 1946); Libbey-Owens-Ford Glass Co. v. Celanese Corp. of America, 135 F.2d 138, 144–145 (6th Cir. 1943); 2 Walker, Patents § 163, pp. 753–55 (Deller's ed. 1937). Thus, in Tyler v. Boston, supra, 74 U.S. at 330, the Supreme Court stated:

> "Where a patent is claimed for such a discovery, it should state the component parts of the new manufacture claimed with clearness and precision, and not leave the person attempting to use the discovery to find it out 'by experiment.'"

Likewise, in Standard Brands, Inc. v. National Grain Yeast Corp., supra, 308 U.S. at 38, 60 S.Ct. at 29, the Supreme Court quoted and agreed with the following conclusion of the court below:

> "* * * But even if the process disclosed by Hayduck be held to constitute invention, the patent is invalid for indefiniteness as was held by the learned District Judge. Both the times and manner in which the concentrated nutrient solution is to be added may be ascertained as we have stated solely by experimentation. The disclosure of the patent is therefore too vague and indefinite to constitute invention.'"

And in Standard Oil Co. v. Tide Water Associated Oil Co., supra, 154 F.2d at 582–583, the court said:

> "The most immediate test of sufficiency of precision in description following from the policy just outlined is that no inventor may compel independent experimentation by others to ascertain the bounds of his claims."

Consequently, even if plaintiffs' evidence is given the maximum credence to which it is entitled, the claims in suit are invalid because the disclosure of the patent is too vague and indefinite

to meet the statutory requirement of precision in describing the alleged invention.

Claims 1 and 6 must also be declared invalid because the patent includes within its disclosure sugars which the evidence shows are inoperative to produce the desired result. Among the sugars specifically mentioned in the specifications as useful are sucrose and raffinose. (Pat. Col. 3, lines 53–56). Professor Smith testified that sucrose and raffinose are inoperative to produce any darkening in the color of potatoes after frying under the conditions specified in the patent. Again, his conclusions are supported by the experimental work conducted by him and Davis. The results as to sucrose are set forth in Defendant's Exhibit 12 (pp. 16–27, 31–34, 36–38). In these experiments potato strips of different varieties which had been stored at different temperatures were blanched in a sucrose solution at 210–212° F., the concentration being varied over a range from .5% to 3% for periods ranging from .5 to 4 minutes. The strips were then fried at 360° F. for periods from 3 to 5 minutes. The color of the fried potato strips was then compared with the color of control potato strips which had been blanched in plain hot water but otherwise similarly treated. Color slides showing the resulting strips were received in evidence (Defendant's Exhibits 11, 13 and 14). The potato strips dipped in sucrose did not acquire in frying any darker color than the control potatoes.[20] Similar tests utilizing a one-minute dip in a 1% raffinose solution at 210–212° F., followed by frying at 360° for 5 minutes, effected no col-

or change as compared to control samples which were blanched in plain hot water under the same conditions (Defendant's Exhibit 12, p. 38).[21]

Professor Smith explained that a sucrose dip may be effective to achieve browning, but only under special conditions which are not disclosed by the patent. Thus, if potato strips are left immersed in a sucrose solution overnight,[22] the invertase in the potato causes at least part of the sucrose to break down by hydrolysis into two monosaccharides, dextrose and fructose, which are reducing sugars and which on frying serve to give the desired browning effect. Very high frying temperatures and long frying times also may cause a breakdown of the sucrose through caramelization to give a brown color. But neither condition is disclosed by the patent. In sum, Professor Smith's testimony, which was fully supported by his experimental work, was that no color change is effected with a sucrose or raffinose solution except under conditions, not taught by the patent, which may give a brown color as the result of hydrolysis or caramelization.[23]

In rebuttal, plaintiffs introduced in evidence the results of an experiment conducted under Saunders' direction during the course of the trial for the purpose of establishing that some browning could be achieved within the ranges of the patent using sucrose and raffinose solutions. This experiment was described in Plaintiffs' Exhibit 33. It involved a series of tests with individual sugars covered by the Baxter patent in an attempt to get browning with each. Both the sucrose and raffinose solutions were

20. In a few instances a slightly darker color may have resulted, but Professor Smith explained that in these cases the sugars in high sugar content potatoes had probably caramelized when longer frying times were used.

21. Professor Smith's tests also show that two other sugars specifically mentioned in the patent, maltose and lactose, and one sugar which is generally included in

the patent, melibiose, do not produce browning. (Defendant's Exhibit 12, pp. 35 and 37.)

22. This was the practice followed by some of the chefs, *supra*.

23. Professor Smith's conclusions as to sucrose are also supported by the prior documentary art. (See, e. g., Denny and Thornton, *supra*.)

**614**

at a concentration of 3% and a temperature of 185° F., and a 3-minute immersion time was used. The sucrose-treated potatoes were fried for 2 minutes at 385° F.; the raffinose-treated potatoes were fried for 2½ minutes at 385° F. Saunders admitted that the maximum sugar concentration and the maximum immersion time specified in the patent claims had been employed in an attempt to get browning with these sugars because in prior experiments he had been unable to do so at other points within the patent range and he knew that these sugars did not work throughout practically the entire range of the patent. It further developed on cross-examination of Frederick W. Turner, an associate of Saunders, who had conducted the actual manipulations for the experiment, that the control samples had been fried for only 1½ minutes at a temperature of 365° F. Turner could not state, therefore, whether the sugar treatment or the longer frying time and higher frying temperature had caused any darkening of the strips which had been treated with sucrose and raffinose. For this reason the experiment was valueless. Significantly also, plaintiffs failed to exhibit the resulting strips in evidence, although counsel had stated that he intended to do so and that the frozen samples were present in Court. There is nothing in the record to indicate what the color of the samples was, and the record contains only the general statements of Saunders and his associate to the effect that the color was "satisfactory" for commercial sale.[24]

Apart from Plaintiffs' Exhibit 33, plaintiffs offered no experimental evidence to show that sucrose and raffinose were effective in carrying out the patented process. Plaintiffs' witnesses admitted that these sugars do not work throughout practically the entire range of the patent. In the view of the Court

the experiment reported in Plaintiffs' Exhibit 33 is wholly insufficient to overcome defendant's comprehensive expert and experimental evidence that sucrose and raffinose are inoperative at any point within the limits stated in the patent claims. Cf. In re Perrigo, 48 F.2d 965, 18 C.C.P.A. (Patents) 1323 (1931).

Claims 1 and 6 in suit envisage the use of "a sugar that may be absorbed by the [potato] particles." Under settled principles, these broadly stated claims must be read in the light of the specification which specifically mentions sucrose and raffinose as useful for the practice of the claimed invention. (Pat. Col. 3, lines 53–56). See Grover Tank & Mfg. Co. v. Linde Air Prods. Co., 336 U.S. 271, 277, 69 S.Ct. 535, 93 L.Ed. 672 (1949); General Electric Co. v. Wabash Appliance Corp. supra, 304 U.S. at 373, 58 S.Ct. 899; Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 255, 48 S.Ct. 474, 72 L.Ed. 868 (1928). But defendant's evidence establishes that sucrose and raffinose are inoperative to produce the desired color change under the conditions specified in the patent. Claims 1 and 6 are therefore fatally defective under the established doctrine that claims to the exclusive use of a class, some of the members of which are inoperative in carrying out the patented process, are too broad and cannot be sustained. Holland Furniture Co. v. Perkins Glue Co., supra at 256–257, 48 S.Ct. 474; Corona Cord Tire Co. v. Dovan Chem. Corp., 276 U.S. 358, 385, 48 S.Ct. 380, 72 L.Ed. 610 (1928); The Incandescent Lamp Patent, supra, 159 U.S. at 472–476, 16 S.Ct. 75; Patrol Valve Co. v. Robertshaw-Fulton Controls Co., 210 F.2d 146, 151–152 (6th Cir. 1954); Libbey-Owens-Ford Glass Co. v. Celanese Corp. of America, supra, 135 F.2d at 145–146; American Chemical Paint Co. v. Firestone Steel Prod. Co., 117 F.2d 927, 929–930 (6th Cir. 1941);

24. In fact, Turner testified that the color of the treated samples, although more uniform, was no darker than that of the untreated control strips.

Matheson v. Campbell, 78 F. 910, 915–916, 923 (2d Cir. 1897).[25]

As the Supreme Court stated in Corona Cord Tire Co. v. Dovan Chem. Corp., supra, 276 U.S. at 385, 48 S.Ct. at 388:

"We come then to the question of the validity of claims 1, 5 and 9 of the patent, which seek to appropriate to the patentee the process of treating rubber by combining with the rubber compound 'a disubstituted guanidine.' Now the class of disubstituted guanidines includes not only D. P. G. but all other derivatives of guanidine in which two of the hydrogen atoms of the guanadine [sic] nucleus have been substituted by other groups. * * * [T]here are between fifty and one hundred substances which answer this description, of which there is quite a number that are not accelerators at all. Weiss could certainly not claim the entire group of such compounds. He makes no showing that there is any general quality common to disubstituted guanidines which makes them all effective as accelerators. Claims for their exclusive use cannot therefore be sustained. This is shown by the decision of this court in the The Incandescent Lamp Patent, 159 U.S. 465 [16 S.Ct. 75, 40 L.Ed. 221], where the court said, at page 475 [16 S.Ct. 79]:

" 'If, as before observed, there were some general quality, running through the whole fibrous and textile kingdom, which distinguished it from every other, and gave it a peculiar fitness for the particular purpose, the man who discovered such quality might justly be en-

titled to a patent; but that is not the case here.' "

For the reasons which have been stated, the Court holds that claims 1, 6 and 7 of the patent in suit are invalid.

■ Judgment will be entered dismissing the complaint, and sustaining the counterclaim insofar as it seeks a declaratory judgment that claims 1, 6 and 7 of Baxter Patent No. 2,498,024 are invalid. Since there has been no showing of such unusual circumstances in this case as to make it grossly unjust for defendant to bear the burden of its own counsel fees, defendant's prayer for an attorneys' fee is denied. 35 U.S.C. § 285. Merrill v. Builders Ornamental Iron Co., 197 F.2d 16, 25–26 (10th Cir. 1952); Wilson v. Seng Co., 194 F.2d 399 (7th Cir. 1952); Park-In-Theatres, Inc. v. Perkins, 190 F.2d 137 (9th Cir. 1951). Compare Plymouth Rubber Co. v. Minnesota Mining & Mfg. Co., 203 F. Supp. 595 (D.C.Mass.1962), aff'd and modified as to scope of injunction, 321 F.2d 151 (1st Cir. 1963); and Grant Paper Box Co. v. Russell Box Co., 106 F. Supp. 616 (D.C.Mass.1952), aff'd, 203 F. 2d 177 (1st Cir.), cert. denied, 346 U.S. 821, 74 S.Ct. 37, 98 L.Ed. 347, rehearing denied, 346 U.S. 905, 74 S.Ct. 216, 98 L.Ed. 404 (1953). Nor, in the view of the Court, has defendant made out a case for the issuance of an injunction. Jaybee Mfg. Corp. v. Ajax Hardware Mfg. Corp., 287 F.2d 228 (9th Cir. 1961). Compare Kessler v. Eldred, 206 U.S. 285, 27 S.Ct. 611, 51 L.Ed. 1065 (1907) and Plymouth Rubber Co. v. Minnesota Mining & Mfg. Co., supra.

Counsel for defendant will submit a proposed form of judgment within ten days.

---

25. This line of authority shows that this doctrine is but a special application of the requirement of 35 U.S.C. § 112, su-

pra, that the patented process must be described so precisely that independent experimentation is unnecessary.